Opinion
 

 POTTER, J.
 

 In these consolidated proceedings, defendant Gregory Tomas (1) appeals from the judgment sentencing defendant to prison for the term prescribed by law on two counts of assault upon peace officers engaged in the performance of their duties "by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (b)), and (2) seeks by writ of habeas corpus to invalidate the judgment upon grounds not apparent from the appellate record. Both attacks upon the judgment are based upon defendant’s claim that he was denied effective assistance of counsel by trial counsel’s incompetence as a result of which crucial defenses were withdrawn from the case.
 

 A full complement of briefs has been filed in both matters. However, defendant has presented all legal argument in his memorandum of argument in support of the petition which has been incorporated by reference as his appellant’s opening brief.
 
 [1]
 
 Inasmuch as all contentions relating both to the appeal and the petition are subsidiary to the claim of incompetence of counsel, they will be discussed herein on the basis of the facts applicable thereto regardless of the source of such facts.
 

 The charges of which defendant was convicted arose out of an incident in which serious injuries were inflicted by defendant upon two Torrance
 
 *79
 
 police officers who were attempting to arrest him. The facts of this incident as related by the People’s witnesses strongly supported the charge. According to Officer Hrehor, one of the victims, he and Officer Cook, the other victim, responded to a report of a disorderly drunk at a bar in Torrance. The bar employee pointed to defendant as the “subject” and advised that he was intoxicated and refused to leave. The officers asked defendant to step outside and escorted him from the bar to the vicinity of the police unit near its front door. Hrehor observed defendant having difficulty staying on his feet, unless he leaned against the police unit, and smelled alcohol. Upon questioning defendant, Hrehor concluded that he was a public drunk in violation of Penal Code section 647, subdivision (f), and advised him that he was under arrest. At this point, defendant stated he was not going to jail and hit Officer Hrehor on the top left side of his head with his closed right fist. Defendant then started running through a parking lot. After chasing him approximately 15 paces, Officer Cook tackled defendant and attempted to restrain him. Cook was joined by Hrehor and the two of them ultimately subdued defendant. Before they accomplished this, however, he repeatedly struck them with his fists and kicked them with his heavy work shoes. Officer Hrehor was kicked over his left eye, raising a lump the size of a walnut.
 

 After defendant was finally subdued and placed in the back seat of the police unit, Hrehor became semiconscious and had to be assisted by Officer Cook. Defendant then attempted to kick out a rear door of the police vehicle. When Officer Cook opened it to deal with the situation, defendant kicked him in the left eye. Both officers required hospitalization. The entire episode was witnessed by a civilian witness who was at the bar when the officers arrived, left at the same time the officers took defendant outside, and observed the altercation at close range. She corroborated the officers’ testimony that defendant “struck out at one of the officers and took off running,” after saying “he wasn’t going to jail.”
 

 A photograph of defendant’s shoes was received in evidence. It shows that they were heavy, work-type shoes. The civilian witness to the altercation identified the shoes from the picture as shoes of a kind that she had sold as a shoe salesperson and stated that “[i]t looks like a steel-toed shoe” of a type sold by her.
 

 Defendant testified in his own behalf. According to defendant, the altercation started when the officer advised him that he was under arrest. Defendant did not want to go so he pulled away. The officers brought him back and when one of them pulled out a night stick, defendant
 
 *80
 
 grabbed it. Defendant did not think that he had swung at the officers and he explained Hrehor’s injury as the result of the fact “he flipped and conked his head on the side of the car. Maybe possibly the door handle.” According to defendant, his sole intention was to get away and he was not “intentionally trying to injure a particular officer.” He explained his conduct on the basis of being “kind of stubborn” as a result of taking too many vitamins which had “thickened my thinking up where I couldn’t really think too much.”
 

 Defendant also called Officer Hrehor who testified that defendant was “stuporously drunk” and “unable to care for himself.”
 

 The oral argument was brief. Defendant was represented by a deputy public defender. He argued first that he did not think the arrest under Penal Code section 647, subdivision (f), was justified. When the court indicated disagreement with this position, counsel argued that all of defendant’s actions were “a result of trying to escape” without “intent here to injure or otherwise harm the officers.” Counsel for the People argued that defendant’s deliberate kicking for the purpose of trying to escape made him guilty as charged and that the use of the steel-toed shoes justified a finding of force likely to produce great bodily injury.
 

 At the conclusion of the oral argument the court found defendant guilty on the two charges. Counsel for the People recommended that the court have a doctor appointed to examine the defendant in connection with probation and sentencing. The court stated orally, “Probation report is ordered. . . . [¶] I will appoint Dr. Deering to examine the defendant and to make his recommendations to the probation department....”
 

 The written “Letter of Psychiatric Appointment,” dated May 13, 1976, however, directed Dr. Deering to file the report in Department SWL, and requested answers to questions as follows:
 

 “2. (1026 PC) Was the defendant sane at the time of the commission of the alleged offense? (‘M’Naghten Insanity’), i.e., first did the defendant have sufficient mental capacity to know and understand what he was doing, and second, did he know and understand that it was wrong and in violation of the rights of another? To be sane and thus responsible to the law for the act committed, the
 
 *81
 
 defendant must be able both to know and understand the nature and quality of his act and to distinguish between right and wrong at the time of the commission of the offense.
 

 3. a (1026 PC) Has the defendant ‘fully recovered his sanity,’ i.e., has he improved to such an extent that he is no longer a danger to the health and safety of others, including himself?
 

 4. 8 (1026a PC) Has he improved to such an extent that he is no longer a danger to the health and safety of others, including himself?
 
 (In re Franklin, 1
 
 Cal.3d 126.)
 

 5. 8 (1368 PC) Is the defendant presently able to understand the nature and purpose of the proceedings taken against him?
 

 6. 8 (1368 PC) Is he presently able to cooperate in a rational manner with counsel in presenting a defense?
 

 7. 8 (1368 PC) Is he presently able to prepare and conduct his own defense in a rational manner without counsel?
 

 8. d Did the defendant at the time of commission of the alleged offense have the mental capacity to
 

 9. 8 Did the defendant at the time of the commission of the alleged offense have the mental capacity to deliberate?
 

 10.8 Did the defendant at the time of the commission of the alleged offense have the mental capacity to premeditate?
 

 11.8 Did the defendant at the time of the commission of the alleged offense have the mental capacity to harbor malice?
 

 form the specific intent to _
 

 _(diminished capacity)
 

 
 *82
 
 12. 0 Did the defendant at the time of the commission of the alleged offense have the mental capacity to meaningfully and maturely reflect upon the gravity of his contemplated acts, and if so to what extent could he so reflect?
 

 13.0 (1026, 1370 PC) In your opinion, should the defendant be required to undergo outpatient treatment in lieu of commitment to a state hospital or other mental health facility, and if so, where and under what financial arrangements?
 

 14. H (1026, 1370 PC) In your opinion, should the defendant be committed to a state hospital or to another mental health facility, and if your answer is ‘another mental health facility,’ where and under what financial arrangements?”
 

 On June 8, 1976, Dr. Deering submitted his report to the court. A minute order of June 25, 1976, recites that Dr. Deering’s services were rendered on June 8, 1976, and awards him $100 as a reasonable sum for compensation and necessary expense. The superior court file as originally transmitted to this court, pursuant to rule 12(a), California Rules of Court, did not contain Dr. Deering’s report.. Subsequently, the original and two signed copies were received. There is no record that any copies of this report were distributed to counsel or to the probation department. The probation report, dictated June 17, 1976, and filed June 24, 1976, recites that it was made “without the opportunity to have viewed the report ordered under section 730 of the Evidence Code.” Pertinent portions of Dr. Deering’s report stated:
 

 “Opinion:
 

 “Although grossly delusional he was probably legally sane at the time of the commission of the offense charged.
 

 “Defendant is not a danger to others but is gravely disabled by his mental disorder and he should be under-conservatorship.
 

 “He is presently unable to understand the nature and purpose of the proceedings taken against him and he cannot cooperate in a rational
 
 
 *83
 

 manner with counsel in presenting a defense.
 
 He had limited ability to deliberate, premeditate and harbor malice. (Italics added.)
 

 “He is not suitable for out-patient therapy. He should be treated in a hospital for general psychiatry.
 

 “He does not require security of Atascadero or Patton State Hospitals.”
 

 The probation report evaluated defendant as “a disturbed, violent and, certainly, extremely dangerous individual” based upon “[t]he circumstances of his numerous arrests dating back to his juvenile years . ...” The probation officer further concluded that “there also seems little doubt but that defendant has a severe drinking problem, which may well have something to do with his volatility when arrested.” The report recommended against probation on the ground “it is difficult to imagine managing one who is so erratic and excitable in a community situation,” and suggested “[i]t may well be that he needs psychiatric care, but there seems little doubt but that his difficulties are such that any effective treatment must be accomplished in a closed setting, either in long-term hospitalization or, perhaps, through medical facilities within the Department of Corrections.”
 

 On June 25, 1976, the court referred defendant “to the Department of Corrections pursuant to Section 1203.03 of the Penal Code,” and continued the proceedings to September 24, 1976. Penal Code section 1203.03, subdivision (b), provides that upon such a referral, “[t]he Director of the Department of Corrections shall . . . cause defendant to be observed and examined and shall forward to the court his diagnosis and recommendation concerning
 
 the disposition of defendant’s case. . .
 
 .” (Italics added.) The department was not requested to report in respect of any other matter.
 

 On August 10, 1976, the diagnostic study and recommendation by the Department of Corrections was submitted. This study was in three parts: a “social evaluation” by a correctional counselor, a “psychiatric evaluation” by a psychiatric consultant, and the recommendation of the “reviewing authority.” The correctional counselor perceived defendant “as an emotionally disturbed, educationally retarded individual” who “definitely has an emotional and alcoholic problem” and “who is in dire need of therapy and external controls.” He did not, however, feel that
 
 *84
 
 defendant “is criminally oriented” or that he was “a danger or threat to the community at large.”
 

 The psychiatric consultant diagnosed defendant as suffering from “[sjchizophrenia, chronic undifferentiated type (with paranoid features) (with some aggravation due to alcohol).” The psychiatrist found “ample evidence of schizophrenia, appearing disorganized, lacking in appropriate affect, and mildly paranoid.” He found that though defendant could make limited social adjustments under good conditions, “he becomes more paranoid and aggressive when he consumes alcohol.” He noted that on interview, defendant appeared peculiar in that “much of the time [he] stares off in another direction while being interviewed.” The psychiatrist concluded that defendant “is very much in need of supervision, but it does not appear that he will accept supervision . . . .” Return to the community would cariy a risk of new violent behavior “especially if he drinks.” Commitment to the Department of Corrections was recommended “in order to provide him the ongoing treatment that he very badly needs” because “[i]t seems unlikely that he would give the cooperation necessary in the Department of Mental Hygiene. ...”
 

 The reviewing authority adopted the psychiatrist’s recommendation stating as reasons: (1) “[h]e is a highly disturbed individual who is reluctant to accept any type of supervision in the community,” (2) “[h]is return to the community at this time would carry the risk of new violent behavior, especially if he continues to drink,” and (3) “[t]he prognosis in this case is most unfavorable, and it seems unlikely that he would give the cooperation necessary if placed in the Department of Mental Hygiene.” The diagnostic study and recommendation did not contain any evaluation of defendant’s present ability to understand the nature and purpose of the proceedings taken against him, or to cooperate in a rational manner with counsel in presenting a defense.
 

 At the continued hearing on September 28, 1976, the court stated: “This is the time set for probation hearing and sentence in this matter” and recited for the record “that the Court has read and considered the report of the diagnostic study and recommendation by the California Department of Corrections, has read and considered the report of the probation officer.” The court made no reference whatever to the June 8, 1976, report of Dr. Deering, nor did it otherwise note, any doubt as to defendant’s competence to stand trial. Formal arraignment for judgment was waived and when the court asked if there was any legal cause why sentence should not be pronounced, defendant’s trial counsel answered,
 
 *85
 
 “None, Your Honor.” After a brief argument in which counsel sought an order granting defendant probation with out-patient therapy, the court denied probation and sentenced defendant to prison for the term prescribed by law. The court, however, recommended “defendant be immediately placed in [a] psychiatric setting for long-term treatment including medication.”
 

 In addition to the foregoing matters of record on the appeal, defendant has supported his petition for a writ of habeas corpus by a showing of matters outside the record, presented by declarations to which several exhibits are attached. The declarations are those of Ellen Fondiler, a student certified pursuant to the provisions of the rules governing the practical training of law students, and Charles M. Sevilla, Chief Assistant State Public Defender.
 

 The Fondiler declaration relates to an interview with the deputy public defender (hereinafter Mr. —) who represented defendant at the trial, and with the matters found in his files and records. In addition to the diagnostic study and the probation report above referred to, Ms. Fondiler found Mr. —’s personal notes taken during an interview with defendant on March 3, 1976. A copy of these notes is attached to the declaration. So far as they are legible, they indicate that defendant identified the victim as Dennis Cook and stated that he was in a bar in a “bad mood” and got into an argument with a “guy” who said he was going to call the cops. Though defendant had had only one beer, a cop called him a name and ordered him out of the bar. Defendant tried to run and the cop slipped and hit his head on the car. The cop had his baton out. Defendant stated that “bar people saw whole thing—will be witnesses,” that defendant was in a bad mood, defendant wasn’t drunk, but got “kind of stubborn.” Final entries of the notes were as follows:
 

 “D says whole problem was vitamins D was taking—B-12 bought on Torr. Blvd. D had 1 beer in bar
 

 “D says doesn’t really understand what is happening—D wants to plead guilty D really has nobody D wants Trial Will cop to 148
 

 “D wants ct trial.”
 

 The Fondiler declaration further states that she examined Mr. —’s case diary but did not make a copy, and “[t]hat diary reflected that Mr. [—] spent a total of approximately 30 minutes with petitioner on March 3,
 
 *86
 
 1976.” Fondiler had a general discussion of the case with Mr. — as the result of which she reported as follows:
 

 “1. Although Officer Cook had a reputation for violent behavior in the community of Torrance, Mr. [—] did not file a
 
 Pitchess
 
 motion because the altercation between Officer Cook and petitioner Tomas was witnessed by civilians.
 

 “2. While reflecting on the fact that an investigation of an insanity defense might have been appropriate, in light of his absence to do so, Mr. [—] stated ‘Perhaps your best issue on appeal is incompetency of counsel.’ ”
 

 The Sevilla declaration described a general discussion between the declarant and Mr. — in which Mr. — informed Sevilla as follows:
 

 “1. That throughout his contact with petitioner, Mr. Tomas remained very noncommunicative.
 

 “2. That Officer Cook had a reputation for using excessive force in affecting arrests in the community of Torrance. However, Mr. [—] did not file a
 
 Pitchess
 
 motion (Pitchess v.
 
 Superior Court
 
 (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]), as there were civilian witnesses to the altercation between petitioner Tomas and Officer Cook.”
 

 Contentions
 

 All of defendant’s contentions, both on appeal and on writ of habeas corpus, are ramifications of his claim that he was denied effective assistance of counsel. In his brief, defendant specifies counsel’s failure to raise four defenses, as follows:
 

 “1. Petitioner was not competent to stand trial;
 

 “2. The plea of not guilty by reason of insanity;
 

 “3. The use of a
 
 Pitchess
 
 motion to impeach Officer Cook;
 

 “4. That lesser included offenses were available to be offered to the trial court in final argument.”
 

 
 *87
 
 In addition, defendant specifies counsel’s failure to make objections to the admissibility of evidence comprising (a) inadmissible hearsay, and (b) the opinion of an unqualified expert.
 

 The People take issue with each and all of defendant’s, contentions, both on appeal and in support of his petition.
 

 In a supplemental brief, defendant has argued that in the light of Dr. Deering’s supplemental report, a hearing to determine defendant’s competency to stand trial was required.
 

 Discussion
 

 We find it unnecessary to reach most of defendant’s contentions. It appears from the record of the superior court proceedings that a doubt arose as to the present sanity of the defendant, i.e., his present capacity to understand the nature and purpose of the proceedings and to cooperate in a rational manner with counsel in presenting a defense, prior to the time sentence was imposed. The court was, therefore, required to initiate proceedings to determine defendant’s competence. The failure to do so requires reversal. Under all the circumstances of this case, it does not appear feasible to make a retrospective determination of defendant’s competence during his trial. Consequently, a. retrial is required once defendant has been found to be competent.
 

 The Trial Court Erred in Not Initiating Proceedings to Determine Defendant’s Competence to Stand Trial
 

 Under Penal Code section 1367, “A person cannot be tried or adjudged to punishment while he is mentally incompetent. . . .” Penal Code section 1368 procedurally implements section 1367 by requiring a court to initiate proceedings to determine present sanity, “[i]f, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant . . . .” Together, these sections embody and protect the constitutional right of eveiy accused to a fair trial that is part of the Fourteenth Amendment’s due process requirement.
 
 (Drope
 
 v.
 
 Missouri
 
 (1975) 420 U.S. 162 [43 L.Ed.2d 103, 95 S.Ct. 896];
 
 Pate
 
 v.
 
 Robinson
 
 (1966) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836].) Since the matter is jurisdictional
 
 (In re Davis,
 
 8 Cal.3d 798, 808 [106 Cal.Rptr. 178, 505 P.2d 1018]), the trial court lacks
 
 *88
 
 power to try, judge or sentence defendant unless he is then presently sane.
 

 The- sanity requirement is satisfied only if an accused person is able to understand the nature of the proceedings against him or her, to consult with counsel, and to assist in preparing a rational defense. (See
 
 Drope
 
 v.
 
 Missouri, supra,
 
 at p. 173 [43 L.Ed.2d at p. 114];
 
 In re Davis, supra,
 
 at p. 808;
 
 People
 
 v.
 
 Humphrey,
 
 45 Cal.App.3d 32, 36.[119 Cal.Rptr. 74].)
 

 When facts giving rise to a doubt regarding a defendant’s present sanity become known to the trial judge, due process requires that the court, on its own motion, suspend proceedings in the case until the question is determined in a sanity hearing. In
 
 de Kaplany
 
 v.
 
 Enomoto
 
 (9th Cir. 1976) 540 F.2d 975, 979-981, the court said:
 

 “The petitioner’s contention regarding the state trial court’s failure to conduct a hearing to determine his competency to stand trial rests upon
 
 Pate
 
 v.
 
 Robinson,
 
 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), as applied in
 
 Drope
 
 v.
 
 Missouri,
 
 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975),
 
 Tillery
 
 v.
 
 Eyman,
 
 492.F.2d 1056 (9th Cir. 1974), and
 
 Moore
 
 v.
 
 United States,
 
 464 F.2d 663 (9th Cir. 1972).
 

 “Before turning to examine these authorities the standard by which competency to stand trial is measured should be stated. In
 
 Dusky
 
 v.
 
 United States,
 
 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held that the ‘test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.’
 
 Id.
 
 An orientation as to time and place and some recollection of events is not enough.
 

 “In
 
 Pate
 
 v.
 
 Robinson, supra,
 
 the Court held that where the evidence raises a ‘bona fide doubt’ as to a defendant’s competence to stand trial,
 
 the trial judge on his own motion must
 
 empanel a jury and
 
 conduct a hearing to determine competency to stand trial.
 
 In determining whether the evidence before the trial judge in the state proceedings in which Robinson was convicted should have entertained such a ‘bona fide doubt,’ the Court reviewed the histoiy of the events of Robinson’s life that it deemed relevant to the issue of Robinson’s competence and concluded that this evidence did entitle him to a hearing.
 
 The failure to provide the hearing ‘deprived Robinson of his constitutional right to a fair
 
 
 *89
 

 trial. ’
 
 383 U.S. at 385, 86 S.Ct. at 842. As in
 
 Dusky,
 
 the Court emphasized that courtroom demeanor, indicating alertness and understanding, alone could not be relied upon to establish competency and justify ‘ignoring the uncontradicted testimony of Robinson’s history of pronounced irrational behavior.’
 
 Id.
 
 at 385-86, 86 S.Ct. at 842.
 

 “In
 
 Moore,
 
 an appeal from a district court’s dismissal of an application for Section 2255 relief, this court was confronted with an applicant who had received a psychiatric examination under 18 U.S.C. § 4244. Even though the psychiatrist’s report concluded that Mopre was competent to stand trial, it nonetheless consisted of a recital of ‘an extensive history of mental illness, including hospitalizations for psychiatric disorders and repeated suicide attempts.’ 464 F.2d at 665. In the face of this report, in which the psychiatrist’s conclusion was markedly at variance with the body of his report and extensive records from the Federal Bureau of Prisons, we concluded that these reports ‘constituted substantial evidence casting a reasonable doubt upon Moore’s competency to stand trial as a matter of law.’
 
 Id.
 
 at 666.
 

 “In describing the principles of
 
 Pate
 
 v.
 
 Robinson
 
 we stated: ‘Under the rule of
 
 Pate
 
 v.
 
 Robinson
 
 (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815,
 
 a due process evidentiary hearing is constitutionally compelled at any time that there is substantial evidence” that the defendant may be mentally incompetent to stand trial.
 
 “Substantial evidence” is a term of art. “Evidence” encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted
 
 or it is in the form of medical reports or other kinds of reports that have been filed with the court.
 
 Evidence is “substantial” if it raises a reasonable doubt about the defendant’s competency to stand trial. Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying
 
 Pate’s
 
 substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? It [s/c] sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant’s competency.
 
 At any time that such evidence appears, the trial court sua sponte must order an evidentiary hearing on the competency issue.
 
 It is only after the evidentiary hearing, applying the usual rules appropriate to trial, that the court decides the issue of competency of the defendant to stand trial.’
 
 Id.
 
 at 666. [Fns. omitted.]” (Italics added.)
 

 
 *90
 
 Our Supreme Court recognized the same requirement in
 
 In re Davis,
 
 8 Cal.3d 798, 808 [106 Cal.Rptr. 178, 505 P.2d 1018], saying: “Accordingly, this court has held that when a ‘doubt’ arises in the mind of the trial judge regarding defendant’s present sanity or competence to stand trial, it becomes his duty to certify the defendant for a sanity hearing; the matter is jurisdictional and cannot be waived by defendant or his counsel.
 
 (People
 
 v.
 
 Pennington, supra, 66
 
 Cal.2d 508, 521;
 
 People
 
 v.
 
 Westbrook, 62
 
 Cal.2d 197, 203-204 [41 Cal.Rptr. 809, 397 P.2d 545];
 
 People
 
 v.
 
 Aparicio,
 
 38 Cal.2d 565, 568 [241 P.2d 221].) Moreover, as pointed out by the United States Supreme Court in
 
 Robinson
 
 v.
 
 Pate,
 
 383 U.S. 375, 384 [15 L.Ed.2d 815, 821, 86 S.Ct. 836], ‘[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently “waive” his right to have the court determine his capacity to stand trial. [Citation.]’ ”
 

 We realize that, as amended in 1974, Penal Code section 1368 appears to provide that when a “doubt arises,” the court is only required to “state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent,” and a hearing is mandated only when defendant’s counsel informs the court “that he believes the defendant is or may be mentally incompetent . . . .” No such statement on the record was made in this case, nor was any such inquiry made of defense counsel. Moreover, it is patent that in light of the above authorities, due process would not be satisfied by any such inquiry resulting in counsel’s stated belief in defendant’s competence in the face of “substantial evidence” of incompetence. We must, therefore, determine whether there was substantial evidence of incompetence in this case. “. . . The doubt which triggers the obligation of the trial judge to order a hearing on present sanity is not a subjective one but is rather a doubt determined objectively from the record. . . .”
 
 (People
 
 v.
 
 Humphrey, supra,
 
 45 Cal.App.3d at p. 36; see also
 
 de Kaplany
 
 v.
 
 Enomoto, supra,
 
 540 F.2d at p. 983.)
 

 The leading California Supreme Court case on the question of what constitutes substantial evidence creating objective doubt is
 
 People
 
 v.
 
 Pennington,
 
 66. Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942], In that case, during defendant’s trial on a not guilty plea, after defendant’s motion for a sanity hearing was denied, one of two psychiatrists testified that defendant did not have the capacity to understand the proceedings or assist his counsel. In reversing the judgment, the court said
 
 (id,
 
 at pp. 518-520):
 

 
 *91
 
 “[W]hen defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under
 
 Pate
 
 v.
 
 Robinson, supra,
 
 383 U.S. 375.
 
 The judge then has no discretion to exercise.
 
 ....
 

 “.. . If a psychiatrist... who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel,
 
 the substantial-evidence test is satisfied. . ..
 

 “[Sjection 1368 requires him [the trial judge] to consider
 
 all evidence of present insanity presented to him prior to sentencing
 
 and to order a hearing on his own motion if the evidence raises a doubt of the accused’s competence to stand trial.” (Italics added.)
 

 There was substantial evidence of defendant’s incompetence to stand trial presented to the court in the form of Dr. Deering’s report. Dr. Deering did not testify under oath. However, his report was submitted to the court under an order appointing him to examine the defendant and to file his report with the court. Similar reports were considered in determining whether there was substantial evidence of mental incompetence in
 
 People
 
 v.
 
 Laudermilk,
 
 67 Cal.2d 272, 286 [61 Cal.Rptr. 644, 431 P.2d 228] (finding evidence insubstantial because of the content of the medical reports, not because of lack of testimony under oath). In
 
 Moore
 
 v.
 
 United States
 
 (9th Cir. 1972) 464 F.2d 663, 666, the court specifically referred to “medical reports or other kinds of reports that have been filed with the court” as evidence raising a doubt as to the defendant’s competence.
 

 It is probable that through oversight, the trial judge did not actually consider Dr. Deering’s report. The trial court’s statements on the record so indicate by reciting "that the probation report and the diagnostic study were read and considered. The existence of three signed copies in the court file suggests that the copies were not distributed to counsel nor to the probation officer who stated in his report that he had not had “the opportunity to have viewed the report ordered under section 730 of the Evidence Code.” Dr. Deering’s report was nonetheless available to the
 
 *92
 
 court and was substantial objective evidence giving rise to a doubt as to defendant’s competence.
 

 It is thus apparent that the court lacked jurisdiction to render its judgment sentencing defendant to prison for the term prescribed by law, and that no further proceedings may be taken against defendant until a hearing has been held to determine his present sanity and he has been found to be presently competent to stand trial. We must, therefore, reverse the judgment so that such action may be taken.
 

 “Under section 1368 of the Penal Code the trial court has no power to proceed with the trial once a doubt arises as to the sanity of the defendant. In trying defendant without first determining at a hearing his competence to stand trial, the court both denied to defendant a substantial right [citations] and pronounced judgment on him without jurisdiction to do so. In such cases the error is
 
 per se
 
 prejudicial. . . .”
 
 (People
 
 v.
 
 Pennington, supra, 66
 
 Cal.2d at p. 521.)
 

 The court in
 
 Pennington
 
 went on to say: “Nor, as the United States Supreme Court specifically held in
 
 Pate
 
 v.
 
 Robinson
 
 [citation omitted] may the error be cured by a retrospective determination of defendant’s mental competence during his trial.”
 
 (Ibid.)
 
 Compare this with the United States Supreme Court’s recent language in
 
 Drope
 
 v.
 
 Missouri, supra
 
 (420 U.S. at p. 183 [43 L.Ed.2d at pp. 119-120): “Given the inherent difficulties of such a
 
 nunc pro tunc
 
 determination under the most favorable circumstances, see
 
 Pate
 
 v.
 
 Robinson,
 
 383 U.S., at 386-387;
 
 Dusky
 
 v.
 
 United States,
 
 362 U.S. [402] at 403, we cannot conclude that such a procedure would be adequate here....”
 

 The facts in this case are no more favorable for a nunc pro tunc determination of competence. In light of the lapse of time and the possibility that defendant has received psychiatric treatment and medication pursuant to the court’s recommendation, we do not think that such a determination would further the interests of justice or adequately protect defendant’s due process rights.
 

 The Judgment Must Be Reversed in Its Entirety Including the Adjudication of Guilt
 

 In
 
 People
 
 v.
 
 Pennington, supra, 66
 
 Cal.2d at page 521, the court determined that “[t]he judgment in its entirety is reversed.” In that case,
 
 *93
 
 the evidence raising a question as to the defendant’s sanity had become apparent during the guilt phase of a bifurcated trial. Consequently, the court’s lack of jurisdiction was apparent before guilt was determined. This case differs in that Dr. Deering’s report was not sought until after the court had determined the issue of guilt. If there were any evidence that defendant’s condition as of the time he was examined by Dr, Deering had deteriorated from that which obtained before and during the trial, we might consider upholding the finding of guilt and leaving only the question of disposition for future determination. All the evidence, however, is to the contrary. Dr. Deering’s opinion was based in part upon his observation of defendant’s “chaotic, disorganized thinking and delusional ideation about the effects vitamins had on his blood.” This same ideation is specifically referred to in the memorandum made by defendant’s trial counsel before his trial and is elaborated in defendant’s testimony at trial. There is at this point no satisfactory way of eliminating the strong possibility that the defendant was not competent during the trial on the issue of his guilt. Under such circumstances, we, like our Supreme Court, are constrained to reverse the judgment in its entirety.
 

 The judgment is reversed and the petition for writ of habeas corpus is denied.
 

 Cobey, Acting P. J., and Allport, J., concurred.
 

 On October 27, 1977, the opinion was modified to read as printed above.
 

 [1]
 

 Unfortunately, the incorporation in this case included the allegations of the petition as well as the “statement of facts” and “argument” supporting the petition. This, of course, is inappropriate inasmuch as the petition comprises largely material not in the appellate record. The • incorporation should have been limited to that portion of the statement of facts relating to the issues properly presented on appeal and to the argument in respect of those facts. Such a reference would be appropriate under California Rules of Court, rule 13.