Filed 4/6/21  P. v. Battreall CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076975 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD278999) |
| SKYLER JACE BATTREALL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon B. Majors-Lewis, Judge.  Reversed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, for Plaintiff and Respondent.

A jury convicted 20-year-old Skyler Battreall of kidnapping during a carjacking (Pen. Code,[1] § 209.5, subd. (a), count 1) and assault with a deadly weapon (§ 245, subd. (a)(1), count 3).  The jury also made true findings on great bodily injury and weapon enhancements.  The court sentenced Battreall to life imprisonment with the possibility of parole, a consecutive five-year term, and imposed certain fees and fines.

On the second day of trial, Battreall became nonresponsive at counsel table, unable to keep his head up or his eyes open.  The next court day, his lawyer asked the court to conduct competency proceedings, explaining that Battreall had attempted suicide and counsel had "a serious doubt" as to his ability to assist in the defense.  The court denied the request.  On appeal, Battreall contends the court erroneously refused to conduct a competency hearing  and that his life sentence violates constitutional prohibitions on cruel and/or unusual punishment.  He also challenges the imposition of fees and fines.

We conclude the trial court erred in failing to conduct a competency hearing.  We further determine that on this record, a retrospective competency determination is not feasible.  Accordingly, we reverse the judgment without addressing Battreall's other contentions.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The People's Case*

In October 2018, Battreall traveled by bus from Texas to San Diego.  After ending up in the Pacific Beach area, at about 9 p.m. he approached a parked car occupied by 21-year-old Brett C.  Battreall told Brett he was from Phoenix, his motorcycle had just been stolen, and he needed a short ride to

---

[1]    Undesignated statutory references are to the Penal Code.

meet someone. Unbeknownst to Brett, none of that was true. Because Battreall was "super nice," Brett agreed to give him a ride.

After a few blocks, Battreall told Brett to turn into a dark residential neighborhood. Battreall pulled out a gun, appeared to chamber a round, and said, " 'I'm not from Phoenix. I'm from Washington and I'm wanted for murder.' " Pushing the gun into Brett's hip, he said, " 'Keep going.' "[2]

Brett drove towards populated beach areas, hoping to find help. Saying, " 'Oh no you don't,' " Battreall grabbed the steering wheel, and in the ensuing struggle they almost hit a parked car. Battreall commanded, " 'Stop the car' " and again put the gun into Brett's hip.

Brett saw two pedestrians on the sidewalk next to the passenger side. Sticking his head through the open sunroof, Brett yelled, "Help[!] He has a gun."

Battreall slammed the gas pedal with his left leg, but Brett had his foot on the brake, keeping the car stopped, engine revving. Battreall hit Brett in the face with the gun, knocking out one of Brett's front teeth and fracturing the other, leaving only the nerve hanging in his mouth. Pointing the gun at Brett and saying, "Get out, get out," Battreall shoved Brett out of the car and onto the street. Battreall slid over and drove away.

By coincidence, a police officer was driving the opposite direction and noticed a vehicle coming toward him suddenly turn off its headlights and abruptly turn at high speed. It was Battreall. About the same time, a police dispatcher broadcast that a carjacking had just occurred in the area. As the officer pursued, Battreall crashed into a parked car and fled on foot. Police

---

[2]    It was actually an unloaded airsoft gun, but it looks like a semi-automatic handgun.

apprehended him a short time later hiding in the backyard of a nearby residence.

B. *The Defense Case*

Testifying in his own defense, Battreall stated that he was removed from his mother's custody when he was three years old because of her drug abuse and prostitution. She died when he was 12. With his father in prison, Battreall was placed in numerous foster homes, where he was often physically and sexually abused. Battreall attempted suicide at age 9, then spent time in a "mental hospital." Eventually he lived with a non-relative where he was "exposed to crime" and drugs.

Battreall's first experience with alcohol was as a toddler (someone spiked his sippie cup) and he started drinking at age 14. He has taken LSD, Oxycontin, methamphetamine, cocaine, marijuana, and ecstasy.

Battreall has two prior theft convictions. Since age 17 he has been living on his own, which he described as "Battreall against the world."

He travelled to San Diego with 100 tablets of ecstasy, over an ounce of cocaine, and $300 worth of marijuana. Before encountering Brett, he had taken "a lot" of cocaine and ecstasy. That night, he was "very high."

Battreall testified he carried the airsoft gun for "protection" because he was a "stranger" in San Diego and "the world is unpredictable." As nightfall approached, and with no place to stay and little money[3], he approached Brett, but without any plan. His thoughts "were everywhere."

When Brett drove into the dark residential area, Battreall was paranoid and panicked, thinking "only the worst could possibly happen to me

---

[3]    Earlier in the day, Battreall paid $150 for a tattoo on his face and took a $60 cab ride from the bus station to Pacific Beach.

in a million ways." He admitted hitting Brett with the gun, but stated, "I was under the influence. I couldn't function or gather my thoughts."

A clinical and forensic psychologist, Kristina Malek, Ph.D., examined Battreall and diagnosed him as having a trauma and stressor-related disorder. Dr. Malek testified that the human brain continues developing to about age 25, and severe childhood trauma can adversely affect that development. She stated that people who are constantly traumatized will be hypervigilant and overreact to perceived threats. In this case, Dr. Malek believes that Battreall misperceived certain environmental "cues"—the dark secluded residential area—and impulsively reacted to that perceived threat and fear.

DISCUSSION

A. *The Court Erred in Determining Not to Conduct a Competency Hearing.*

1. *Additional Factual Background*

Mid-morning during the second day of trial testimony, and after informing the jury that Battreall was "very ill right now," the court excused the jury for the rest of that Friday. With the jury gone and paramedics en route, the court remarked that Battreall "seems to be out of it, ill . . . ." Nonetheless, the judge emphasized that "I don't want to stop this trial and have a mistrial." Defense counsel stated that Battreall's "eyes are red and rolling," and he "couldn't keep his head up or his eyes open." The court responded that "we have to finish this trial. We are invested now at this point." Shortly thereafter, paramedics transported Battreall to a hospital.

The next court day (Monday), outside the jury's presence the court stated, "I want to get the jury in here because we lost pretty much a day last week and we're now almost an hour later than I wanted to get started." The court noted that late Friday the clerk received an e-mail from defense counsel

5

stating he intended to move for mistrial. Although the motion had not yet been filed the court denied it stating, "I'm not going to grant a motion for mistrial."

The court told counsel that she had spoken to her bailiff "this morning, who told me he accompanied Mr. Battreall last week" to the hospital. She continued, "I got some information as well about what may have happened, so I don't think that has anything to do with whether he understands the nature of the proceedings against him and whether he is able to assist in his own defense."

Defense counsel asked to address the court "ex parte in camera" because he had "a serious doubt as to Mr. Battreall's competency." Counsel explained that he met with Battreall the previous night (Sunday). He said, "[B]ased on our confidential privileged communication, I believe that this was an attempted suicide." Counsel added, "Based on my conversations with him, Your Honor, I do not believe he is grounded. I believe that there may be signs that he is going into a psychosis. He's not the same as he was prior to this incident, and I think the court should really take—"

Interrupting, the court stated, "you have really put me in a bind. The first time I am hearing about this—you could have e-mailed me yesterday.[4] You could have told me this and I could have had you all come in here early. I am not buying it." The court stated "there is some malingering going on here." The court directed the jury to be brought in and stated, "we will take it up on a break."

---

[4] The previous court day, in response to the prosecutor's suggestion that defense counsel e-mail "the Court directly and myself" with an update on Battreall's condition, the court stated, "I don't ever take e-mails."

Meanwhile, the prosecutor filed a summary of a recorded jail telephone conversation occurring on August 21 (two days before Battreall was unresponsive at counsel table) between Battreall and a woman in Texas. During the call, Battreall discussed jury selection and had a cogent conversation about recent events.

At mid-day, outside the jury's presence the court stated the recorded conversation "seems to indicate that at least on the 21st and 22nd, I am not going to go into it right now because it's lunchtime, but Mr. Battreall at that time had a very good idea of what was happening in the trial, what was left to be done, of the jury selection process and so forth." The court said it would dismiss the jury early and allow defense counsel to "talk about it at length."

After the court dismissed the jury at 4:24 p.m., counsel asked to be heard "on my request under Penal Code section 1368," remarking, "I have been asking to be heard all day today."[5] Without permitting argument, the court said, "Let me rule on that," and explained that her bailiff had informed her that Battreall's hospitalization "wasn't a big deal."

> "The Court: I have been told that at the hospital, the defendant may have taken multiple doses of his prescribed medication, *and I have been told from my deputy, who spoke to the medical staff there*, who indicated that it wasn't a big deal, they didn't have to pump his stomach and they were just observing him and that it might make him a little bit woozy. So they didn't keep him. They didn't pump his stomach. So there was no indication that he had overdosed." (Italics added.)

Despite prefacing her remarks with, "Let me rule on that," the court deferred a final ruling to the next day. She told defense counsel, "So, tomorrow we will take it up. But I don't think you can overcome it because

---

[5]    Section 1368 pertains to inquiries into a defendant's mental competence when doubt arises prior to judgment.

7

he is attentive, and [the jail call] belies the fact that he doesn't understand the nature of the proceedings." Before leaving the courtroom, defense counsel asked the court for "at least 30 to 40 minutes" for argument the next day. After the court responded, "I'm not going to guarantee that," defense counsel stated, "Then I want to talk about it now." The court replied, "You can't boss me around."

The next morning (Tuesday), the court announced that it would not give defense counsel "30 to 45 minutes" because it "only takes a couple of minutes" to show a person is incompetent to stand trial. The court informed counsel she was considering appointing a mental health expert "to help determine whether to order a competency hearing." Referring to another ex parte communication with her bailiff, the court stated the deputy reported that Battreall's only prescribed medication is an inhaler for asthma.

Defense counsel responded, "Mr. Battreall was not able to keep his head up. I had to—I tried to get his attention a couple of times. Finally I got his attention. He looked at me. His eyes were completely red and they started rolling in the back of his head." The following colloquy occurred next:

> "The Court: Stop. That has nothing to do with his mental competence. . . . [W]e stopped the whole trial in the middle of a witness and we recessed for the entire day and we took him to the hospital and they did not come back with any diagnosis again. Their only thing they said was that he was dehydrated. He had not taken any medication that required his stomach to be pumped. I don't know if he's malingering. I don't know if he took a pill. . . ."

> "Defense counsel: I don't know any of what you're saying about his records or diagnosis is true. We have no documentation to prove that."

8

Defense counsel added that not only had Battreall attempted suicide on Friday, "[h]e has not been medicated for two months."[6]

The court replied, "I can't let you just give me hearsay that he attempted suicide." In response, defense counsel told the court that when the paramedics arrived on Friday, Battreall told them he had taken 14 Trazodone pills. Counsel explained, "I believe that he attempted suicide and I had a serious doubt as to his ability to rationally assist me in his defense. Due to my conversation with him, he appeared to not be mentally sound." Counsel asked for an in camera hearing where he could privately disclose these privileged communications. But the court rejected that, stating, "No, I can't go ex parte."

Addressing defense counsel, the court added, "Are you really saying to the court that because your client may have taken—purposely taken some medication that he knew he was not supposed to take in quantities, but he knew he was not supposed to take, that he gets a free ride now?" "You're talking about someone and saying, from hearsay statements that he told you or told paramedics that he took 14 pills . . . . [¶] But the question is, did he just do something to temporarily make him foggy or does he have a mental condition that prohibits him from helping his own defense. I would say the evidence is contrary to that."

Referring again to the recorded jail call, the court stated, "The phone call belies your argument that he doesn't understand the nature of the proceedings again [*sic*] him." When defense counsel noted, "All of that evidence predates the suicide attempt," the court replied, "It doesn't matter." "I cannot buy that he actually, in two days, lost his competency. I am not

---

6    According to defense counsel, on intake at the jail Battreall had been prescribed Remeron and Trazodone, anti-depressants.

sending him for a [section] 1368 no matter what you say, but I am willing to temporarily ask for an expert to be appointed to determine whether he is entitled to a full [section] 1368 [evaluation]. And I do intend to keep this jury on call." The court further stated, "I'm not going to give you the mental competency hearing unless I think he's incompetent."

The court then questioned Battreall, asking if he was "following" the witness testimony. Battreall replied, "As thoroughly as my mind will let me, Your Honor."

Again the court stated, "I don't believe that he's incompetent to stand trial under [section] 1368. I still don't believe that." Concluding there was no "objective substantial evidence of the defendant's incompetence," the court denied the requested competency hearing.

2. *Legal Standards for Holding a Competency Hearing.*

"The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial. [Citations.] Section 1367 . . . incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*People v. Flinner* (2020) 10 Cal.5th 686, 760 (*Flinner*); accord *People v. Johnson* (2018) 21 Cal.App.5th 267, 276 (*Johnson*) [competence means " 'the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense' "].)

The defendant has a right to a competency hearing " 'if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of

assisting in his defense.' " (*Flinner, supra,* 10 Cal.5th at p. 760.) "[S]ubstantial evidence for this purpose is evidence 'that raises a reasonable or bona fide doubt' as to competence . . . ." (*Ibid.*) Where the defendant makes this showing, the court must hold a competency hearing, and it is immaterial that the prosecution's evidence of competency, or the court's own observations of the defendant, may be to the contrary. (*People v. Rodas* (2018) 6 Cal.5th 219, 231 (*Rodas*).)

Suicide attempts, in combination with other factors, may constitute substantial evidence raising a bona fide doubt regarding a defendant's competence to stand trial. (*People v. Rogers* (2006) 39 Cal.4th 826, 848.) However, evidence of mental illness alone is insufficient to raise a doubt as to competency. [Citation.] Bizarre statements or actions, taken in isolation, do not require a court to hold a competency hearing." (*In re Sims* (2018) 27 Cal.App.5th 195, 209.)

3. *The Trial Court Based its Determination on Inadmissible Hearsay Acquired Through Improper Ex Parte Communications with the Bailiff.*

Battreall was clearly incompetent to stand trial when on August 23 he "seem[ed] to be out of it" , his "eyes [were] red and rolling," and he "couldn't keep his head up or his eyes open." The critical issue is whether there was evidence creating a reasonable doubt of Battreall's competency thereafter. The trial court determined there was no such evidence because (1) two days earlier in the recorded jail phone call, Battreall cogently described jury selection and other matters; and (2) the bailiff reported that according to hospital staff, Battreall did not overdose but was merely dehydrated.

The fundamental problem with the court's analysis is that the communications between the court and the bailiff were conducted outside the parties' presence. The court stated, "I think he is malingering," adding, "*And*

11

*for your information*, my deputy, Carlos Saldivar, was there at the hospital." (Italics added.)

> "The Court: And my deputy asked the question, 'Why aren't you pumping his stomach? And my deputy is the one that did give me hearsay that said there's really nothing wrong with him. . . . So the hearsay that you're talking about comes from my deputy who I trust. I find him to be an honest person. [¶] So I don't think he's incompetent."

These ex parte communications violate judicial norms. The Code of Judicial Ethics (Code) provides, "A judge shall not initiate, permit, or consider ex parte communications, that is, any communications to or from the judge outside the presence of the parties concerning a pending or impending proceeding, and shall make reasonable efforts to avoid such communications . . . ." (Cal. Code Jud. Ethics, canon 3B(7).) The Code further provides, "In any discussion with . . . court personnel, a judge shall make reasonable efforts to avoid receiving factual information that is not part of the record or an evaluation of that factual information." (*Id.*, canon 3B(7)(a).) "Court personnel" includes bailiffs. (*Ibid.*)

Moreover, not only was the court's ruling based on ex parte communications with the bailiff, the bailiff's report of what hospital staff told him is inadmissible hearsay—actually, two levels of inadmissible hearsay. And while there is no reason to doubt the deputy's veracity in reporting that conversation, the evidentiary concern is not with his credibility. The hearsay problem is that hospital staff—the hearsay declarants—were not in court and, therefore, not subject to cross-examination. As defense counsel sharply noted, "I don't know any of what you're saying about his records or diagnosis is true."

Also troubling is the court's application of a double standard. In determining that there was "nothing really wrong" with Battreall, the court

12

relied on hearsay—the bailiff's report of his communications with hospital staff. But when defense counsel reported that Battreall stated he had overdosed, the court replied, "I can't let you just give me hearsay that he attempted suicide."

### 4. *The Court Abused Its Discretion in Refusing Defense Counsel's Request for an In Camera Hearing.*

Upon returning to court on Monday (three days after Battreall was hospitalized), defense counsel asked to speak to the court "ex parte in camera," stating he had "a serious doubt as to Mr. Battreall's competency." Counsel had met with Battreall the previous night and stated, "based on our confidential privileged communication, I believe that this was an attempted suicide." The court refused counsel's request, stating, "I can't have any ex parte communications with the defense attorney while we are in the middle of a trial, and especially since the matter is pending."[7]

The next day, the prosecutor filed points and authorities that cited California Rule of Court,[8] rule 4.130(b)(2), which authorizes defense counsel to present his or her opinion regarding competency in camera if privileged attorney-client communications would be disclosed.[9] Defense counsel renewed his request for an in camera hearing, stating:

---

[7] The court never explained why it believed the prohibition on ex parte communications did not also apply to her communications with the bailiff about Battreall's hospitalization.

[8] Undesignated references to rules are to the California Rules of Court.

[9] Rule 4.130(b)(2) provides in part: "The court may allow defense counsel to present his or her opinion regarding the defendant's mental competency in camera if the court finds there is reason to believe that attorney-client privileged information will be inappropriately revealed if the hearing is conducted in open court."

"Defense counsel: The paramedic asked [Battreall] what he took, and I heard 14 Trazodone. When I went to go visit him, after I visited him, based on my confidential privileged communication with him, I believe that he attempted suicide and I had a serious doubt as to his ability to rationally assist me in his defense. Due to my conversation with him, he appeared to not be mentally sound. He was saying things to me that he had never said before that I believe are confidential and privileged that I would be happy to go and discuss with the court."

Without explanation, the court denied counsel's request, stating, "No, I can't go ex parte." In light of rule 4.130(b)(2), this was a mistake. The court's lack of awareness of and failure to exercise the discretion that rule 4.130(b)(2) affords is itself an abuse of discretion. (*People v. Lettice* (2013) 221 Cal.App.4th 139, 147.)

5. *The Court Applied an Incorrect Legal Standard*

When faced with conflicting evidence regarding competence, the trial court's role is only to decide whether there is substantial evidence raising a reasonable doubt of incompetence—not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing. (*Rodas*, *supra*, 6 Cal.5th at p. 234.) It is only after the evidentiary hearing that the court decides the issue of competency. (*People v. Tomas* (1977) 74 Cal.App.3d 75, 89.)

In this case, entirely apart from engaging in inappropriate ex parte communications, considering inadmissible hearsay, and erroneously refusing the requested in camera hearing, the court also erred by applying an incorrect legal standard. Despite the complete absence of any psychological evaluation of Battreall's competence to stand trial, the court adjudicated the ultimate issue, stating, "I'm not going to give you the mental competency hearing unless I think he's incompetent."

14

The closest the court came to articulating the correct standard occurred immediately before ruling, when the court stated, "I don't have at this point objective substantial evidence of the defendant's incompetence . . . ." But even this formulation is incorrect. The issue was not whether there was substantial evidence of incompetence, but whether there was substantial evidence *raising a reasonable doubt* of competency. (*People v. Tejeda* (2019) 40 Cal.App.5th 785, 793 (*Tejeda*).) Further, the evidence raising such doubt need not be "objective." Rather, it is the ruling that is measured by an objective standard. The doubt triggering the obligation to order a hearing is one that a reasonable jurist would have in light of the defendant's showing. (*Johnson, supra*, 21 Cal.App.5th at p. 276.)

Moreover, that Battreall appeared lucid days earlier during the recorded jail phone call does not necessarily mean he remained competent. Mental health can be fluid; Battreall's competency could change even in a short time, especially in light of defense counsel's representation that Battreall, who had been prescribed antidepressants on jail intake, had not been medicated for two months. (See *Johnson, supra*, 21 Cal.App.5th at p. 277.) " 'Even when a defendant is competent at the commencement of [their] trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " (*People v. Hines* (2020) 58 Cal.App.5th 583, 632.)

We recognize that not every suicide attempt creates a reasonable doubt as to competency. But where a suicide attempt occurs in the midst of trial and is accompanied by other evidence (such as a significant mental health history), the calculus may raise a reasonable doubt of competency. (See *Maxell v. Roe* (9th Cir. 2010) 606 F.3d 561, 570–571 [discussing cases where a competency hearing was required when defendant attempted suicide].)

We also understand the trial court's concern that Battreall may have been attempting to game the system by means of a self-inflicted overdose designed to delay trial.[10] But the relevant issue is not whether the evidence is sufficient to support the trial court's finding that Battreall was competent. The question is whether there is substantial evidence that he might not be competent. (*Johnson, supra*, 21 Cal.App.5th at p. 280 [if there is substantial evidence that the defendant "*might* be incompetent, due process dictates a full exploration of [his] mental health"].)

In sum, in denying defense counsel's request for a competency hearing, the trial court (1) improperly relied on ex parte communications with the bailiff; (2) improperly considered inadmissible hearsay of hospital staff; (3) erroneously refused to consider defense counsel's request for an in camera hearing; and (4) applied an incorrect legal standard. Any one of these errors might well require reversal. Considered together, they manifestly compel that result.[11]

### 6. *A Retrospective Competency Hearing is Not An Appropriate Remedy in This Case.*

Ordinarily when a trial court erroneously fails to order competency proceedings, the judgment is reversed because the court has deprived the

---

[10] The Court: "Are you really saying to the court that because your client may have taken—purposely taken some medication that he knew he was not supposed to take in quantities, but he knew he was not supposed to take, that he gets a free ride now?"

[11] Because of this disposition, it is unnecessary to address Battreall's contentions that the court's rulings were the product of judicial bias. In any event, " '[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 447.)

defendant of due process. (*Gonzales*, *supra*, 34 Cal.App.5th at p. 1086.) However, the Supreme Court has left open the possibility that in some cases, a retrospective competency hearing may be an appropriate remedy. (*Rodas*, *supra*, 6 Cal.5th at p. 238.) "In cases involving unusual circumstances where reliable evidence of the defendant's mental condition at the time of trial would be available," appellate courts have found a retrospective competency hearing to be an appropriate remedy on remand. (*Gonzales*, at p. 1088.) "The key question in determining whether retrospective relief is feasible is whether there is sufficient evidence in the record to reliably determine the defendant's mental competence *at the time of his earlier trial*. [Citation.] In 'unusual circumstances' the record may include 'reliable evidence of the defendant's mental condition' at that earlier point in time. [Citation.] But where, as is typically the case, the defendant exhibits fluctuating symptoms, significant time has passed, or there is a lack of contemporaneous expert evaluations, reliable retrospective evaluation is simply not feasible." (*Tejeda*, *supra*, 40 Cal.App.5th at p. 796.)

We conclude this case does not present the unusual circumstances that would make a retrospective evaluation of Battreal's competency feasible. As is so often the case, the insurmountable problem is the lack of an adequate record. (See *People v. Ary* (2004) 118 Cal.App.4th 1016, 1028 ["there will seldom be sufficient evidence of a defendant's mental state at the time of trial" due to the "trial court's initial failure to hold a timely competency hearing"].) There was no reasonably contemporaneous expert evaluation of Battreall's mental state, and this evidentiary void is only compounded by trial court's failure to allow defense counsel an in camera opportunity to provide additional information.

Moreover, the Supreme Court has cautioned courts about the
" 'inherent difficulties' " of a retrospective competency determination where a
defendant displays "fluctuating . . . symptoms" in conjunction "with the
passage of time, and the lack of contemporaneous expert evaluations."
(*Rodas*, *supra*, 6 Cal.5th at pp. 239–240.)  Battreall's case has all these
earmarks.  What little the record contains on the question of competency is
that Battreall exhibited fluctuating symptoms that may have been
medication dependent.  He was clearly incompetent when unresponsive at
counsel table on the second day of trial, but cogent just two days earlier
during the recorded jail call.  It is now three years after the fact, and without
the benefit of any contemporaneous psychiatric evaluation in the record, a
retrospective determination would neither be fair nor produce a reliable
result.  (*Id.* at p. 240.)

## DISPOSITION

The judgment is reversed.  Battreall may be tried on the charges for
which he was previously convicted if he is competent to stand trial.[12]

DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

---

[12]     In light of the trial court's receipt of ex parte communications regarding
Battreall's competency to stand trial (*ante*, Discussion at part A.3),
proceedings on remand should be assigned to a different judicial officer.