[Crim. No. 32511. Second Dist., Div. Five. July 31, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN SCHNEIDER, Defendant and Appellant.

674

## COUNSEL

Lee B. Ackerman, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ASHBY, J.**—By jury trial appellant was found to have committed robbery and to have been sane at the time of the commission of the offense. (Pen. Code, §§ 211, 1026.) He was sentenced to state prison.

At about 11 a.m. on April 15, 1977, appellant, dressed in a topcoat, top hat, and heavy glasses, entered the La Cumbre Plaza branch of the Security Pacific National Bank in Santa Barbara. He approached teller Consuelo Perez, muttered something about money, then produced a suitcase and placed it on the counter. She could not understand what he was saying, and he pulled out a gun (subsequently shown to be a BB pistol) and pointed it at her. She handed over about $1,000 but he demanded more money. When she replied she had none, he pointed to the teller's area on her left and directed her to get money from that station. She obtained another $1,000 from this location and placed all the money in the suitcase.

The bank manager's secretary observed appellant leave, carrying an attache case from which money was protruding. Appellant drove away in a U-Haul truck which the secretary and her husband followed until the police caught up with it.

Deputy Sheriff Sotak, having received information about the robbery and getaway vehicle, observed the U-Haul truck on the freeway and began to follow it. After Deputy Sotak followed for approximately one-half mile with siren and red lights, the truck exited the freeway. After another two miles, the truck passed a sheriff's jeep driven by Deputy

Sheriff Taylor, who joined in the pursuit. Deputy Taylor fired a shot through the back of the truck. The truck again entered the freeway and proceeded southbound until it crossed over to the center divider and stopped.

Deputy Taylor removed appellant from the truck, placed him on the ground and handcuffed him. Appellant kept saying, "It was only a BB gun," and that "It's in a cardboard box." Inside the truck were found the suitcase of money from the bank, a BB gun set, and a top hat and topcoat.

Appellant testified in his own behalf, denying that he had ever been in the bank on the day in question. He denied that he robbed the bank and did not recall the suitcase. He related his activities on the day in question as follows: He had stayed at a motel and rented the U-Haul truck the night before. He was planning to go to Los Angeles. That morning he bought some boots, a sleeping bag and a BB gun set. Upon leaving the store, he had a few drinks from a bottle of whisky he had purchased previously. After the drinks, he began to have dreams and flashbacks how in 1972 he had accompanied his mother to the La Cumbre Plaza bank, now Security Pacific National Bank, to help her cash a social security check.

Realizing he had had too much to drink, and fearful of causing some trouble, he decided to leave Santa Barbara. He turned the wrong way on a one-way street and someone started blowing a horn at him. This upset him and he entered the freeway. He then noticed a police car following him. He left the freeway, but was approached by another sheriff's vehicle and saw a person in that vehicle raise a rifle. The gun fired and appellant was hit. His reaction was to try to get away and he entered the freeway. However, he pulled over because he was hurt.

A defense of diminished capacity was presented at the guilt phase of the trial supported by the testimony of Drs. Crahan and Lambert. Dr. Crahan testified that in his opinion appellant was a paranoid schizophrenic. He believed appellant had been suffering from this mental defect for a number of years and was definitely suffering from it on the date of the robbery. In his opinion, appellant lacked the capacity to form a specific intent to rob. Appellant did not know the money belonged to someone else. Appellant "didn't know what he was doing"; he "didn't know he was robbing a bank."

Dr. Lambert testified that in his opinion appellant was suffering from a mental abnormality and lacked a proper appreciation of reality. This

abnormality was "a borderline state, that is a state that is between a frank psychotic mental state and a neurotic mental state. . . . It is more serious and severe than a neurotic state, and it isn't the same as a psychotic state, inasmuch as most of the time the condition is not clearly insane or crazy, but under stress, very slight stress, and particularly use of alcohol or drugs, then the individual becomes in fact psychotic to the degree that their appreciation and understanding of reality is seriously distorted or disturbed." Appellant denied committing the robbery but recalled being in that same bank in 1972 with his mother when his mother tried to withdraw her funds and was not permitted to. In Dr. Lambert's opinion appellant was "acting out his fantasy of making some kind of retribution in the bank, something that had to do with his mother, something that was going to restore his image of himself as a strong or adequate or supporting person, some kind of retribution for the injustice he felt his mother had suffered."

Dr. Patterson testified for the prosecution in rebuttal that appellant had no impairment of mental function which would interfere with his ability to form the intent to rob. In his opinion appellant was not schizophrenic or borderline psychotic. He had only a nonpsychotic personality disorder. Appellant was lying and was going to great effort to appear to be a paranoid.

For purposes of the sanity phase of the trial, Dr. Lambert testified for the defense and Dr. Patterson for the prosecution as to appellant's sanity under the M'Naghten test. Dr. Lambert testified that in his opinion appellant was not able to understand the nature and consequences of his actions and was unable to distinguish between right and wrong. Dr. Patterson testified that appellant had the capacity to understand the nature and quality of his acts and that he knew what he was doing was wrong.

CONTENTIONS

Appellant contends (1) that the court erred in refusing to hold a hearing pursuant to Penal Code section 1368 to determine appellant's competence to stand trial; (2) that the conviction must be reversed due to an intervening change in the test of insanity used in California (*People* v. *Drew*, 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]); and (3) that the court erred in certain instructions on the purposes of the psychiatric testimony and in failing to instruct *sua sponte* on evidence of other crimes. We find no merit in these contentions.

## Penal Code Section 1368

Appellant contends that there was substantial evidence raising a doubt as to his competence to stand trial and that the court erred in failing to hold a hearing under Penal Code section 1368 to determine that issue. (*People* v. *Pennington,* 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].)

On July 7, 1977, at the request of defense counsel, the court appointed Drs. Patterson and Wells to examine appellant to determine his competence to stand trial, i.e., to understand the nature and purpose of the proceedings and to assist counsel in his defense. (*People* v. *Pennington, supra,* at p. 515.) Both doctors reported to the court that appellant was competent to stand trial.

On August 31, 1977, appellant entered an additional plea of not guilty by reason of insanity, and Drs. Lambert and Patterson were appointed to examine appellant pursuant to Penal Code section 1027.

On September 14 defense counsel (the public defender) reported to the court that appellant wished the court to dismiss the public defender and to appoint Attorney O'Neill, who had briefly represented appellant in federal bank robbery proceedings arising out of the same incident. Defense counsel assured the court that, although he personally had some doubt, he could not say appellant was incapable of understanding the nature of the proceedings since both doctors, as well as an attorney who specialized in psychiatric matters to whom defense counsel had referred appellant, believed appellant was competent.

On September 15 the court announced that Mr. O'Neill did not wish to represent appellant, and had merely made a short appearance for appellant in the federal matter, the federal authorities having decided "that they would let the matter be handled here in Santa Barbara because of the double charge."

The public defender, however, had changed his opinion from the previous day. He stated that he now believed appellant was incompetent, and he argued that the court was required by Penal Code section 1368 to conduct a hearing if defense counsel requested one. The court continued the matter until September 19.

■ On September 19 the court stated that it had no doubt as to appellant's competence, and that the mere statement of defense counsel that he believes the defendant incompetent is not itself sufficient to require the court to order a hearing. This conclusion was correct. (*People* v. *Laudermilk,* 67 Cal.2d 272, 287 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Hays,* 54 Cal.App.3d 755, 759 [126 Cal.Rptr. 770]; *People* v. *Stewart,* 89 Cal.App.3d 992, 996 [153 Cal.Rptr. 242].)

■ Defense counsel then claimed that two psychiatrists who had examined appellant in connection with the federal charges had concluded that he was not then competent to stand trial. Counsel did not produce such alleged reports, however, and when offered a continuance by the court in order to do so, he declined. In these circumstances the court had reason to discount counsel's allegations. (Cf. *People* v. *Laudermilk, supra,* 67 Cal.2d 272, 277, fn. 3, 286, 287.) The only evidence before the court was the reports of the two psychiatrists the court had appointed, which concluded appellant was competent. Based on the evidence before it, the court properly refused to hold a hearing. (*People* v. *Stewart, supra,* 89 Cal.App.3d 992, 996-997.)[1]

Appellant next contends that appellant made a statement during the trial which suggested incompetence and that the court should have held a Penal Code section 1368 hearing during trial. After appellant testified to the jury, he testified outside the presence of the jury that he did not understand why he was being prosecuted in state court because he thought he had been released once to go to federal court and that the federal charges had been dropped. The court commented that nothing in appellant's testimony up to that point had indicated incompetence to stand trial. Furthermore, the court did not believe appellant's testimony that he did not understand why he was being prosecuted. Finally, the court commented that the area of dual federal and state prosecution for bank robbery was a technical point, and that even if appellant's testimony was sincere, some confusion on the part of a lay person was understandable, and was not indicative of lack of competence to stand trial. In these circumstances the court properly concluded that this testimony raised no

---

[1]Defense counsel also alleged that appellant's behavior at a hearing before another judge on August 24, 1977, indicated lack of competence. At that hearing appellant had handed a cashier's check for $550 to the bailiff and had explained to the court that he wanted it used to get him out of jail. The court at that time interpreted the action simply as an attempt to make bail. The trial court at the September 19 hearing could justifiably treat the August 24 incident as a slight misunderstanding of bail procedures and not as bizarre behavior indicating inability to understand the proceedings or assist in the defense.

substantial evidence of incompetence, and that no section 1368 hearing was required.

Finally, appellant argues that there was evidence of incompetence in the diagnostic study which had been ordered from the Department of Corrections pursuant to Penal Code section 1203.03, and that the court should have ordered a section 1368 hearing prior to sentencing. This report stated that while in custody for the diagnostic process appellant experienced auditory hallucinations and his behavior was bizarre, unpredictable and provocative. The prison psychiatrist's diagnosis was schizophrenia, chronic undifferentiated type, predominantly paranoid. The report indicated that appellant was dangerous and should not be released to the community. But that report did not address itself to the issue of appellant's competence to understand the nature of the proceedings and assist in his defense. That the report found him dangerous or schizophrenic does not constitute substantial evidence of his inability to stand trial. (*People* v. *Laudermilk, supra,* 67 Cal.2d at p. 285.) The case of *People* v. *Tomas,* 74 Cal.App.3d 75 [141 Cal.Rptr. 453], cited by appellant, is distinguishable because in that case there was specific psychiatric opinion that the defendant was not able to understand the nature and purpose of the proceedings or cooperate with counsel. (*Id.,* at pp. 82-83, 91.) Finally, appellant's conduct at the sentencing hearing indicated that he understood the nature and purpose of the proceedings.

Thus neither prior to trial, during trial, nor prior to sentencing was the court required to hold a Penal Code section 1368 hearing.

### Insanity Instructions

The trial court instructed the jury on the then applicable M'Naghten test of insanity, which is whether the defendant knew or understood the nature and quality of his act or knew or understood that it was wrong. Subsequently the California Supreme Court adopted the American Law Institute test, which is whether the defendant lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (*People* v. *Drew, supra,* 22 Cal.3d 333.) The *Drew* test applies retroactively to cases not yet final (*id.,* at p. 348) and thus we must determine whether the trial court's failure to instruct in terms of the *Drew* standard was prejudicial. The test of prejudice is whether it is reasonably probable the jury would have found appellant insane if the case had been tried, and the jury instructed, under the ALI standard. (*Id.,* at p. 352; *In re Ramon M.,* 22 Cal.3d 419,

431 [149 Cal.Rptr. 387, 584 P.2d 524]; *People* v. *Sargent,* 86 Cal.App.3d 148, 153 [150 Cal.Rptr. 113]; *People* v. *Wagoner,* 89 Cal.App.3d 605, 613 [152 Cal.Rptr. 639]; *People* v. *Stewart, supra,* 89 Cal.App.3d 992, 1000; *People* v. *Phillips,* 90 Cal.App.3d 356, 365-366 [153 Cal.Rptr. 359]; *People* v. *Wischemann,* 94 Cal.App.3d 162, 168-171 [156 Cal.Rptr. 386].)

The chief reason cited by *Drew* for abandoning the M'Naghten test of insanity and substituting the ALI test is that the M'Naghten test focuses exclusively on the cognitive capacity to know what is right and wrong but disregards those types of mental illnesses in which the subject knows his act is wrong but cannot control his will or emotions. (*People* v. *Drew, supra,* 22 Cal.3d at pp. 341-346.) In other words, the ALI test adds a volitional element. (*Id.,* at p. 346; *People* v. *Wischemann, supra,* 94 Cal.App.3d at p. 168.)

In this case psychiatric evidence was presented on appellant's behalf during the guilt phase on the issue of diminished capacity. Dr. Crahan testified that in his opinion appellant was a paranoid schizophrenic and that when appellant robbed the bank he did not know the money belonged to someone else; he "didn't know what he was doing"; he "didn't know he was robbing a bank."

Dr. Lambert testified that appellant had a mental abnormality; that appellant denied robbing the bank; and that in his opinion appellant was acting out a fantasy related in some way to his mother's attempt in 1972 to withdraw funds from that bank.

Appellant testified at trial, denying that he was present at the bank or in any way participated in a robbery.

Thus, even under the defense evidence, appellant's mental illness was not the type to which the change of law in *Drew* was directed. All the psychiatric evidence here indicates that if appellant had a mental illness it was the type which rendered him incapable of knowing that he was robbing a bank. There is no substantial evidence that he knew he was robbing a bank but was incapable by reason of mental disease or defect of controlling an impulse to rob a bank. (*People* v. *Wischemann, supra,* 94 Cal.App.3d at p. 170.) In these circumstances it is not reasonably probable that a different result would have been reached had the psychiatrists testified, and the jury been instructed, on the ALI standard. Thus in this case the use of the then applicable M'Naghten test at trial does not require reversal.

There is nothing in *Drew* or the post-*Drew* cases which supports the proposal in the dissent to apply a different standard of reversal, which virtually amounts to a rule of reversible error per se. In *Drew*, 22 Cal.3d at page 352, and *In re Ramon M., supra,* 22 Cal.3d 419, 431, the court pointed to substantial evidence in the record that as a result of mental disease or defect the defendant was substantially unable to control his conduct, and concluded that under the ALI test the trier of fact "probably" would have found defendant insane. The Courts of Appeal have consistently interpreted this to mean that there is no rule of reversible error per se and that on appeal the record must be weighed to determine under the *Watson* standard (*People* v. *Watson*, 46 Cal.2d 818, 836-837 [299 P.2d 243]; Cal. Const., art. VI, § 13) whether it is reasonably probable a different result would have been reached under the ALI test. (*People* v. *Stewart, supra,* 89 Cal.App.3d 992, 1000; *People* v. *Wagoner, supra,* 89 Cal.App.3d 605, 613; *People* v. *Phillips, supra,* 90 Cal.App.3d 356, 365-367; *People* v. *Wischemann, supra,* 94 Cal.App.3d 162, 168-171.)

## INSTRUCTION ON PSYCHIATRIC TESTIMONY

After Dr. Lambert testified to appellant's diminished capacity it was agreed by the parties that for the convenience of the witness he should be permitted to give his conclusion at that time as to whether appellant was insane under the M'Naghten test. In explaining to the jury what was to take place, the court instructed the jury that the testimony it was about to hear would be relevant only in the second phase of the trial if there was one.

Appellant now complains that this was erroneous, citing *People* v. *Wetmore,* 22 Cal.3d 318 [149 Cal.Rptr. 265, 583 P.2d 1308]. His reliance on *Wetmore* is misplaced. *Wetmore* held that a defendant has a right during the guilt phase of trial to introduce evidence showing that he had diminished capacity to entertain a specific intent required of the offense, notwithstanding that such evidence also tends to show insanity. In the instant case, however, appellant was not deprived of any such opportunity, since two psychiatrists testified extensively as to appellant's diminished capacity. The only testimony limited by the instruction was the simple legal conclusion whether appellant met the M'Naghten test of insanity. No error was committed.

## OTHER CRIMES EVIDENCE

Appellant contends that the court admitted evidence of other crimes by appellant and that the court erred in failing to instruct the jury

*sua sponte* on the limited purposes for which other crimes evidence may be received. The record does not support this argument.

On cross-examination Dr. Lambert was asked by the prosecutor whether in forming his opinion he considered the fact alleged in reports available to him that appellant had been accused of two other bank robberies in San Francisco and had "bait money" from one of those banks in his possession when arrested. Dr. Lambert replied that he did not consider that fact because he did not know whether it had been proved appellant committed those robberies. He had asked appellant about them, and appellant had denied them. Defense counsel brought out that appellant had never been convicted of a felony and that the instant case was the only charge pending against him.

The circumstances do not require instruction on the admissibility of other crimes. The trial court *did* instruct the jury that "[t]here has been admitted in evidence the testimony of a medical expert of reports he considered in the course of an examination of the defendant which was made for the purpose of diagnosis. The information contained in those reports may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. Such information is not to be considered by you as evidence of the truth of the facts disclosed by the reports." Thus the evidence was admitted only for the proper limited purpose of showing the type of information discounted by Dr. Lambert in drawing his conclusions. Since under the instruction which was given, the jury had no occasion to consider the truth of the allegations that appellant had committed other crimes, there was no occasion for instruction on other crimes.

The judgment is affirmed.

Hastings, J., concurred.

**STEPHENS, Acting P. J.**—I respectfully dissent.

INSANITY INSTRUCTIONS

The trial having been conducted before the California Supreme Court adopted the American Law Institute test for insanity in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], the jury was instructed and the experts questioned under the then applicable criteria

of the M'Naughten test. Since the court in *Drew* specifically provided that their decision was to apply retroactively to all "cases not yet final in which the defendant has pled not guilty by reason of insanity" (22 Cal.3d at p. 348), the ALI test is applicable to this case.

The differences between the M'Naughten test for insanity, which has been applied in the courts of California since 1864 (*People* v. *Francis C. Coffman* (1864) 24 Cal. 230, 235) and the ALI test is primarily that the ALI test adds to the cognitive element of M'Naughten (whether the defendant knew or understood the quality and nature of his act or knew that it was wrong) an additional volitional factor. The ALI test asks whether the defendant as a result of mental disease or defect lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Because the trial was conducted under the M'Naughten test, I would hold that appellant did not have a trial on his insanity plea and accordingly reverse the conviction and remand the case to the trial court for a trial on the issue of appellant's plea of not guilty by reason of insanity.

This is not the first case to reach the appellate courts in the procedural posture of appellant's case. Research has revealed six other cases that were tried before *Drew*, but which were not yet final at the time that decision was rendered. Of these six, three cases were remanded back to the trial court for a trial on the insanity plea, and three affirmed the convictions. All six, however, approached the question of the prejudice to a defendant having been tried under the now incorrect M'Naughten test on the basis of whether the error was prejudicial under California Constitution, article VI, section 13, i.e., whether it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of error. I reject this approach for the following reasons:

The three cases to affirm convictions in spite of the erroneous use of the M'Naughten test are *People* v. *Wagoner* (1979) 89 Cal.App.3d 605 [152 Cal.Rptr. 639]; *People* v. *Stewart* (1979) 89 Cal.App.3d 992 [153 Cal.Rptr. 242] and *People* v. *Wischemann* (1979) 94 Cal.App.3d 162 [156 Cal.Rptr. 386]. In *People* v. *Wagoner* the court was faced with an insanity plea based upon voluntary intoxication with heroin. The court examined the record to "determine if there is a reasonable probability" that a jury instructed as to the ALI test would have found appellant not guilty by reason of insanity (89 Cal.App.3d at p. 613). However, finding that the rule of *People* v. *Kelly* (1973) 10 Cal.3d 565, 575-576 [111 Cal.Rptr. 171, 516 P.2d 875], "that a mental disorder produced by voluntary intoxication

is only a complete defense to a general intent crime if the disorder extends beyond the period of intoxication" (89 Cal.App.3d at p. 614) is unaltered by the adoption of the ALI test, the *Wagoner* court found that the failure of appellant's intoxication to result in insanity that outlasted the intoxicated state ("settled insanity"), deprived him entirely of the insanity defense to the general intent crime charged (furnishing heroin to a minor). Therefore, the court concluded that a different result would not have obtained under the ALI test and affirmed the conviction.

Likewise, in *People* v. *Stewart, supra,* 89 Cal.App.3d 992, the court found that since "(t)he entire psychiatric testimony concluded that appellant was suffering from a passive-aggressive personality disorder," appellant had failed to meet either the cognitive or the volitional prongs of the ALI test. The court therefore concluded ". . . that it is not reasonably probable that if the ALI test were employed that appellant would have been declared insane. (Cal. Const. art. VI, § 13.)" Hence, both *Wagoner* and *Stewart* presented situations where the courts could say as a matter of law that the defendants *could not* be found insane under the ALI test; each defendant lacked the basic foundation to an insanity defense under both M'Naughten and ALI, a mental disease or defect. Wagoner's voluntary intoxication did not result in "settled insanity"; Stewart's personality disorder fell short of a mental disease or defect that would interfere with his ability to appreciate or control his actions.

The third case, however, *People* v. *Wischemann, supra,* 94 Cal.App.3d 162, presents a rather different factual situation. In that case, the experts were sharply divided on the defendant's sanity. One psychiatrist characterized the defendant's mental state as both psychotic and schizophrenic. The other doctor rejected both diagnoses, and said that the defendant was merely depressed. The court nonetheless concluded, "[g]iven the totality of circumstances, we see no reasonable possibility that additional proceedings could adduce any new evidence that would convince a jury that defendant's intellectual capacity was so affected by mental illness that he was unable to prevent himself from engaging in these robberies [citations]." (94 Cal.App.3d 162, 169.) The problem with this approach is that it necessitates a weighing of expert and lay witness testimony against what a new avenue of inquiry *might* reveal. The court specifically noted that witnesses to the four robberies with which defendant was charged failed to detect any bizarre behavior and that the defendant had no past history of mental illness. Further, the court pointed out that "[d]espite the extensive and wide ranging testimony of

defendant's psychiatric and emotional state, no mention was made of delusions, hallucinations, brain damage or uncontrollable impulses or rages that would negate defendant's will and impel him to commit armed robberies." (94 Cal.App.3d at p. 170.) However, this kind of speculation as to what testimony might have been adduced had the psychiatrists been directly asked to consider whether the defendant could control his behavior or how defense counsel might have conducted the defense differently had the trial been conducted under the ALI test is inimical to the appellate process.

The three cases that reversed the convictions of the defendants and remanded the cases to the trial courts used the same "reasonably probable more favorable result" test. (*In Re Ramon M.* (1978) 22 Cal.3d 419, 431 [149 Cal.Rptr. 387, 584 P.2d 524]; *People* v. *Sargent* (1978) 86 Cal.App.3d 148, 153 [150 Cal.Rptr. 113]; *People* v. *Phillips* (1979) 90 Cal.App.3d 356, 365-367 [153 Cal.Rptr. 359].) The most recent of these cases, *People* v. *Phillips, supra,* although apparently feeling itself bound to the prejudicial error test, expressed its concern over the state of the record on appeal. The court said, "While the jury decided appellant had the cognitive ability to know the nature and quality of the act and that it was wrong, we are left to speculate as to what might be the finding if the evidence were presented and the jury instructed under the more expansive volitional concept of the ALI test. There is substantial evidence that appellant lacked volitional capacity under the ALI definition of sanity. [¶] In summary, the issue of volition and ability of appellant to conform his conduct to the requirements of the law under the ALI rule, as distinguished from knowledge of the nature and wrongfulness of appellant's conduct, was not considered in witness interrogation or instructions because of the understandable reliance of the court and counsel on the then applicable M'Naghten rule." It is my opinion that the *Phillips* court should have stopped there, and simply remanded the case so that the appellant could have a trial on his insanity plea. However, the court went on to conclude that "[t]here is substantial evidence that appellant lacked capacity to conform his conduct to legal requirements," making it "reasonably probable that if the ALI test were employed that appellant would have been declared insane, and therefore the failure to so instruct was prejudicial. (Cal. Const. art. VI, § 13.)" (90 Cal.App.3d at pp. 366-367.)

When an appellate court is faced with conflicting evidence on an issue as basic as the sanity or insanity of a defendant, a more principled approach when a new standard has been adopted would be to simply

remand the case for trial on the insanity plea on the basis that because of the erroneous application of legal standard, the defendant did not get a trial on the issue. This would avoid different results in very similar cases, as in *Phillips* and *Wischemann,* where each court recognized that there was conflicting evidence from the experts, but reached different conclusions as to the import of that evidence upon a theretofore unconsidered legal criteria. Rather, cases like these should be approached like the jury instruction cases, which deal with the concept that "a defendant has a constitutional right to have the jury determine every material issue presented by the evidence; that an erroneous failure to instruct on a lesser included offense [or defense] constitutes a denial of that right; and that such error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have [reached a result more favorable to the defendant]." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], citing *People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33]; see also *People* v. *Stewart* (1976) 16 Cal.3d 133 [127 Cal.Rptr. 117, 544 P.2d 1317]. The fundamental importance of this concept was stressed in *People* v. *St. Martin* (1970) 1 Cal.3d 524, 532 [83 Cal.Rptr. 166, 463 P.2d 390], in which the court held that an erroneous failure to give an instruction on an affirmative defense relied upon by the defendant, constituting a denial of his right to have the jury determine every material issue presented by the evidence, "is in itself a miscarriage of justice . . ." After all, what is the defendant's right to have the jury determine every material issue presented by the evidence but a right to a trial. Unless we reverse appellant's conviction and remand his case to the trial court, he would be deprived of having the jury determine every material issue of his case, and thereby of having a trial on his insanity plea.

In another context, the California Supreme Court has decried any attempt by appellate courts to speculate on matters upon which the record is silent. In *People* v. *Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715], the court was faced with the effect of the change in law occasioned by the *Escobedo* case. A confession obtained from defendant *Spencer* in violation of the *Escobedo-Dorado* rule was admitted at trial, which took place prior to *Escobedo.* Ordinarily, on appeal, this would have been regarded as reversible error per se. However, the prosecution argued that the error was harmless, since the defendant had subsequently fully admitted guilt while on the stand. The Supreme Court had then to decide whether the subsequent confession in court was impelled by the previously admitted extrajudicial confession. The court held that since the prosecution had failed to show "beyond a reasonable doubt" that the

causative link between the two confessions was broken (a burden placed upon the prosecution by *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]), the conviction was reversed. The court pointed out ". . . the prosecution urges us to speculate upon the defendant's motives for testifying and to infer, from a record which leaves the issue completely unexplored, that his decision to confess in court did not emanate from the erroneous receipt in evidence of his extrajudicial statement of guilt. We cannot posit so important a determination on so conjectural a base." (66 Cal.2d at p. 168.)

In the instant case, the record amply discloses that the psychiatrists were in conflict regarding appellant's mental condition. While Doctor Crahan testified that appellant was a paranoid schizophrenic, Doctor Lambert did not diagnose appellant's condition in those terms. Rather, he testified that appellant was suffering from a mental abnormality that he characterized as a borderline state and that, in his opinion, appellant was acting out a fantasy related in some way to his attempt to withdraw funds from the same bank in 1972. Doctor Patterson, on the other hand, testified that he felt that appellant had the capacity to understand the nature and quality of his act and the consequences. However, none of these physicians were asked whether appellant could control his behavior. Absent this line of questioning and jury instructions governing the ALI test, appellant was deprived of a trial on his insanity plea. I do not feel compelled to speculate as to what the outcome may be when the case is remanded. It is enough that appellant would, for the first time, be receiving a trial on his insanity plea under the now applicable standard. To this he is entitled. Surely public policy considerations preponderate in favor of courts taking every possible precaution in singling out those individuals who are not criminally responsible for their acts and who would not benefit from the punishment by incarceration due to their present inability to control their aberrant behavior. Such imprisonment can only be highly detrimental, as it withholds treatment that otherwise might produce rehabilitation. (See *Wade* v. *United States* (9th Cir. 1970) 426 F.2d 64, 66-67.)

I would reverse the judgment of sanity and remand for a retrial on that issue.

A petition for a rehearing was denied August 21, 1979. Stephens, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied September 26, 1979.