[Crim. No. 11755. Fourth Dist., Div. One. Oct. 26, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
NEAL RODNEY SUNDBERG, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Barbara A. Smith, Deputy State Public Defender, and Carmela Simonicini for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Keith Motley and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—Neal Rodney Sundberg was charged with the murder of Steve Larry Johnson (Pen. Code, § 187) and the personal use of a firearm in the commission of that murder. Sundberg noticed a pretrial motion to dismiss (Pen. Code, § 995); but before hearing of the motion, criminal proceedings were suspended for the purpose of conducting an examination as to Sundberg's present sanity, his competence to stand

trial (Pen. Code, § 1368). At a jury hearing on that issue, he was found not mentally competent to stand trial and he was placed in Patton State Hospital. Some months later he was returned to the criminal court and rearraigned, where he pleaded not guilty and not guilty by reason of insanity. After a jury trial of the guilt phase, Sundberg was convicted of second degree murder with the finding he personally used a firearm. Upon further trial of the insanity issue, he was found to be sane at the time of the killing. Sundberg was sentenced to prison for 17 years to life. He appeals, contending the trial court erred in denying his motion for a further Penal Code section 1368 mental competency hearing; alternatively he asserts he was denied effective counsel by virtue of the fact the trial attorney withheld facts surrounding his diminished capacity evidence and his delusional conspiracy defense. Finally, Sundberg contends he was entitled *sua sponte* to a diminished capacity instruction based upon the evidence before the jury.

FACTS

Sundberg went to the Huntress Bar for the second time on the morning of May 13, 1979, shortly before the 2 a.m. closing time. He asked if he had time to have a beer and was told 10 minutes. A few minutes after receiving the beer, the bartender asked him to turn in his beer as it was late and he had collected everyone else's. Sundberg told him to get everyone else's and then he would give him his. Bartender Joe Baumgardner grabbed Sundberg's bottle of beer and a tug of war ensued. Bar patron Steve Johnson, a 5-foot and 11-inch, 170-pound male, walked up behind Sundberg and grabbed him around the neck and pulled him away from the bar, knocking off Sundberg's glasses. Sundberg let go of the beer, causing the bartender to fall backwards against the other side of the bar. Sundberg backed towards the front of the bar with Johnson following him. Johnson then hit Sundberg in the face with his fist and Sundberg fell to the floor, knocking over another patron. At this point, Sundberg had pulled a pistol from inside his windbreaker and shot Johnson. Johnson turned sideways and started for the front door. Sundberg followed, firing a total of nine shots. The last two shots were fired outside the bar room when Johnson lay prone on the sidewalk. The two shots entered the back of Johnson's head, killing him.

Sundberg testified his glasses were pulled from his face; he could not see, his view was badly out of focus. He contends he attempted to get away from Johnson and the bartender but he had no chance since Johnson was 20 years younger; Sundberg thought Johnson was 6 feet 5

inches and weighed 250 pounds and he looked like the "Incredible Hulk." Sundberg testified he thought the bartender and Johnson were going to kill him. Since Johnson kept coming after him, he pulled his pistol and started shooting and did not stop until the ninth shot was fired. He then put his gun back into his pocket "so no one would feel threatened," returned to the bar to get his glasses. He thought it was better to get out of there and so departed.

## DISCUSSION

### I

Sundberg contends there was substantial and uncontradicted evidence he was incapable of assisting his attorney in the presentation of a rational defense and therefore the trial court erred in denying the defense counsel's motion for a mental competency hearing (Pen. Code, § 1368).

The following facts are relevant to this issue. The trial court was aware of Sundberg's mental history. There had been the prior adjudication of Sundberg's incompetence to stand trial in this matter. Shortly before trial commenced at a hearing scheduled on defendant's motion to exclude certain statements, the trial judge (Gilliam) discussed with both parties the various aspects of presenting the issue of diminished capacity and whether the same jury could hear and decide both the guilt or innocence issue and the not guilty by reason of insanity issue. Shortly before this hearing Sundberg had been examined by Dr. Barron and Dr. Davis, appointed by the court to examine him by reason of his insanity plea. These doctors informed the court that Sundberg was suffering a paranoid schizophrenia and he had delusions relating to a conspiracy to kill him because of an inheritance that he should have had some 20 years ago. Nonetheless, without the question being asked, the court volunteered the conclusion that Sundberg was mentally competent to stand trial. Two days later (Feb. 4) Sundberg was examined by Dr. Kripke, employed by the defendant. Kripke made the same findings of paranoid schizophrenia, delusions of a conspiracy to be killed related to an inheritance. Kripke did not find that Sundberg was mentally incompetent to stand trial. Thus as defense counsel admitted at commencement of trial, all five psychiatrists who had examined Sundberg found that despite delusions he was then mentally competent to stand trial.

The matter of the diminished capacity defense was discussed at the pretrial February 4 and the February 14 meetings with the court. Sund-

berg's counsel (Gusky) expressed his views that he did not want to raise diminished capacity "because we feel if we do go with the diminished capacity, the tendency would be that the jury would go towards a compromise. And so we want to take our best shot possible on the justifiable homicide and then decide after we see the flavor of the evidence at that point whether or not to deviate to the additional defense of a diminished capacity." It was with this articulated counsel choice of strategy that the diminished capacity issue was not raised in the guilt phase of the trial.

Five days later the jury was selected and the trial commenced. Sundberg testified in his own defense. Sundberg's testimony essentially reflected his view of a self-defense justification for the killing. Little came into evidence before the jury concerning his delusions. However, at the conclusion of redirect examination of Sundberg, he had been shown a picture of the deceased victim and he suddenly commenced to laugh. He explained to the court that the body of the decedent must have been switched by the police because the body depicted in the photograph was not the man he shot. In chambers, Judge Gilliam again made inquiry into defense counsel's intention regarding putting on evidence of Sundberg's diminished capacity. Counsel Gusky reiterated his tactical position. He was afraid the jury might ignore a possible verdict of justifiable homicide. At this hearing in chambers, Sundberg made such observations as: "All I know is I am being framed and it was self-defense. The police are framing me." Then he said regarding his lawyer: "No, he never talked to me about anything, nothing, ever.

"The Court: He never talked to you about diminished capacity?

"Defendant: Huh-uh.

"The Court: You didn't tell him you wanted to go with the diminished capacity?

"Defendant: No, we never discussed anything about the trial."

Mr. Gusky said that he had discussed these matters with his client. The defendant responded "That's a lie. Probably J. Paul Getty has got to him to. I am the rightful heir to J. Paul Getty. He murdered my brother and father." At this time the deputy district attorney suggested "I think perhaps a conference between the defendant and his counsel might be appropriate." The court then questioned "Have you had any

type of drug or any type of medication." Defendant said "No I haven't. My story is true. I can't prove it, though."

Then the court questioned Sundberg at length. The defendant maintained his position: he was framed; the coroner described the wrong body. Witnesses were shown the wrong body. He persevered on the subject of the conspiracy to be framed for murder plus his claim as to being the heir of J. Paul Getty. "They must have gotten to the police. Who knows who else?"

But Sundberg insisted he was sane. "... I'm sane. I have been writing from state and county hospitals that I am sane. Why would I raise that?" Defendant insisted "... I never have had any mental problems. That was all explained, if you remember, by Judge Lowe, who J. Paul Getty probably got to. I wanted to be my own lawyer and I told Judge Lowe that. He said that would be fine 'because you were your own attorney over in Judge Ward's court over in federal court so I think you can be your own attorney here, too. But just to be sure, I'll have you see the court psychiatrist to check out, to see if it would be all right if you could be your own attorney.' ... Instead of checking out to see if I could be my own attorney, they committed me to Patton Hospital, most likely on Judge Lowe's orders. I think J. Paul Getty got to Judge Lowe. That's what they did to my mother and brother too."

The court questioned: "You didn't want anything about your mental capacity to come up in this trial?

"The Defendant: Absolutely not, because there is nothing wrong with me." This colloquy followed:

"The Court: Do you understand there is enough evidence there that the jury might find you guilty of first degree murder?

"The Defendant: I imagine the police could put a gun up to my head when I walk out of court, and blow my head off, but nothing I can do about it.

"The Court: But there is a possibility that the jury could find you guilty of first degree murder.

"The Defendant: Of course, the way they've got it arranged.

"The Court: There is some evidence that you did have a mental problem.

"The Defendant: But that's fake, also.

"The Court: But if Mr. Gusky put that into evidence, they might not be willing to find you guilty of first degree, they could then find you guilty of second degree, or reduce it down to manslaughter.

"The Defendant: But I don't want that.

"The Court: Mr. Gusky can put that evidence in. He says you don't want it, so he's not going to put it in.

"The Defendant: Right." After conferring in private with Mr. Gusky, Sundberg said he was satisfied he didn't want anything about his mental condition offered.

When the jury was being reinstructed, Sundberg made several interjections charging that his lawyer had been paid off. "He's not even presenting my evidence. Can prove the police framed me." The jury returned with the finding of guilty of murder in the second degree with the use of the firearm.

## II

On March 3 the court convened for the trial of the sanity phase. At this hearing, Mr. Gusky told the court that during the guilt phase of the trial Mr. Sundberg's mental condition continually deteriorated and that by the time closing argument took place, the inappropriate laughter, outbursts and comments to counsel indicated that he was not concentrating on the trial or aware of what was going on nor competent to stand trial. *Mr. Gusky further stated that on February 29 he had contacted psychiatrist Dr. Kripke who had previously examined Sundberg on February 4 and in Dr. Kripke's opinion defendant was not competent to stand trial.* The lawyer reported that on the morning of the 20th during the trial the defendant wrote "I am just tired and worn out to write any more. I want to go home now." During the prosecutor's rebuttal argument, defendant was smiling and giggling inappropriately. The lawyer stated: "I came to the conclusion at that time that he had reached a point of disassociating himself from the trial or he had become so much involved with the thoughts of being J. Paul Getty or J.

Paul Getty's adopted son and worth a lot more money. I felt at the time that he would no longer be able to cooperate with me."

The lawyer conceded: "I talked with the defendant this morning. He seemed in a much better frame of mind and I have not a strong as doubt as I had on Friday as to his ability to cooperate; but *I do, in light of what happened at the trial and the fact that his defense, not guilty by reason of insanity phase, will require me to have him on the stand for lengthy cross-examination—I do feel that I have a doubt right now as to whether or not he could cooperate with me during that phase, and I would ask the Court to have him examined by another psychiatrist, and make that determination before we proceed any further.*" The court made this response to the lawyer's request and statement:

"The Court: How do you feel today?

"Defendant: Like he says. I'm pretty fed up and tired.

"The Court: Do you understand what's going on.

"Defendant: Pardon?

"The Court: Do you understand what's going on?

"Defendant: Perfectly, yes. I'm just worn out and tired. I've had it.

"The Court: Well, we have to finish this trial.

"The Defendant: Yeah. Well I'll force myself. I would like to be as comfortable as I can." And in addressing Mr. Gusky, the court said: "Do you think you can understand what he says and talk to him.

"The Defendant: Absolutely. I understand everything.

"The Court: Did you understand what he say to you just now?

"Defendant: I certainly do.

"The Court: And what did he say?

"Defendant: I can't repeat the whole thing.

"The Court: In substance.

"Defendant: In essence, I think what he just said is what I told you; I am worn out, tired, fed up with the whole thing, but I can continue. As long as God gives me the strength, I'll continue, sure." The court continued to question the defendant further and concluded: "Mr. Gusky, his answers are responsive on to what I talked to him about. He seems to be aware of what is going on, and I don't have any doubt as to his present sanity. So, I think we're ready to proceed.

"Mr. Gusky: Thank you, your Honor."

At this point the deputy district attorney asked the court: "Could we have a statement from your Honor regarding conduct of the trial. How you felt during the course of the trial?

"The Court: During the course of the trial, it appeared to me throughout the trial that the defendant appeared to be normal as he could be, knowing that he had some type of mental problem. However, he understood what was going on. Only in the last days of argument, I think last Friday, he made some comments and he appeared to make some comments last Friday when we were instructing for—reading of the instructions to the jury. He said 'Fine he wouldn't do that.'

"Defendant: You can be assured there will be no more of that."

Thus the defense request for an examination of the defendant to determine his present sanity was not responded to except by the court's questioning of the defendant himself ending up with a finding that the defendant knew "what was going on."

In the course of the trial of the sanity phase, the defendant again alluded over and over to the existence of a conspiracy to kill him, to deprive him of his rightful inheritance, of being assaulted by various and sundry people. From Sundberg's testimony, we conclude the world as viewed by Sundberg is filled with aggressive people seeking to smash him, to blind him, to kill him and to deprive him of his inheritance; people are coming out of bushes, first giants and then five 30-year-old white males "who look like Mafia police." In face of this on-the-stand demonstration of present delusional thinking, the jury found the defendant was sane at the time he killed Johnson. Sundberg's objective demonstration of a mental illness was supported by two psychiatrists

who in their opinion stated Sundberg was a paranoid schizophrenic operating under an elaborate delusional system at the time of the killing. He was unable to appreciate the criminality of his act. The prosecution's witness also recognized the defendant as paranoid and operating under this delusional system but attributed his killing to emotional release of anger and hostility towards bigger men. The prosecutor admitted certainly the victim did not approach the "Incredible Hulk" picture. At the motion for new trial, further psychiatric testimony indicated that Sundberg's whole focus was now on being the rightful heir of J. Paul Getty and he claimed to be "Lear Jet," the adopted son of J. Paul Getty.

## III

It is an established principle of law that the conviction of an accused while he is legally incompetent violates due process of law. (*Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed 815, 818, 86 S.Ct. 836]; *People v. Laudermilk* (1967) 67 Cal.2d 272, 282 [61 Cal.Rptr. 644, 431 P.2d 228]; *Posner v. Superior Court* (1980) 107 Cal.App.3d 928, 931, fns. 2, 3, 4, 5, 6 [166 Cal.Rptr. 123].) California statutes are totally in accord with this principle. (See Pen. Code, § 1367.) (2) Penal Code section 1368 provides: "(a) If, during pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney of the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . .

"(b) If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental incompetence is to be determined in a hearing which is held pursuant to section 1368.1 and 1369."

A literal reading of section 1368, subdivision (b), points to a conclusion that if the attorney informs the court of his belief in the possible incompetence of his client, then the court shall order a hearing. However, several appellate court decisions since 1974 interpreting subdivision (b) of section 1368 have concluded the mere statement of the defense counsel he believes defendant incompetent is not itself sufficient to require the court to order a hearing. (See *People v. Schneider* (1979) 95 Cal.App.3d 671, 678 [157 Cal.Rptr. 314]; *People v. Stewart* (1979) 89 Cal.App.3d 992, 996 [153 Cal.Rptr. 242]; *People v. Hays* (1976) 54

Cal.App.3d 755 [126 Cal.Rptr. 770].) The section has been further interpreted to require objective substantial evidence of doubt as to the defendant's mental competence before he is entitled to the full hearing pursuant to section 1368. (See *People v. Stewart, supra*, 89 Cal.App.3d 992, 996 and cases cited; see Parker, *California's New Scheme for Commitment of Individuals Found Incompetent to Stand Trial* (1975) 6 Pacific L.J. 484, 506.) When a judge's attention is called to the issue. of incompetency or he suspects the possibility, then he has the duty to determine whether there is substantial evidence to require the full hearing. As to the nature of proof which is necessary in order to constitute the substantial evidence necessary to give rise to the constitutional right to a hearing on present sanity, the evidence must be such that he is incapable because of mental illness of understanding the nature of the proceedings against him or of assisting in his defense. And once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence may be. Testimony of prosecution witness or of the court's own observation of the accused may be to the contrary, yet "when the defendant comes forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right." (*People v. Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) And as was said in *People v. Laudermilk, supra*, 67 Cal.2d 272, 283: "Paraphrasing our remarks to another context, the question as to what constitutes such substantial evidence in a proceedings under section 1368 'cannot be answered by a simple formula applicable to all situations.' [Citation.]" In *Pennington*, sufficient evidence of such incompetence consisted of the following: The expert opinion of a qualified psychologist based upon a previous diagnosis of schizophrenia and paranoia, a current diagnosis of a more paranoid condition; defendant's current unfeigned hallucinations and defendant's fits of psychotic furor observed by witnesses in the courthouse and during the trial. And further *People v. Pennington, supra*, held that the testimony of the first psychologist "was by itself substantial evidence which compelled the court to order a section 1368 hearing." (*Id.*, at p. 519.) And in *Pate v. Robinson, supra*, 383 U.S. 375, the sufficient evidence consisted of the testimony of four lay witnesses as to a long history of disturbed behavior suggesting mental illness, the express opinion of all four that the defendant was insane, and additional evidence as to his brief confinement in a state mental hospital.

Furthermore, this doubt which triggers the obligation of the trial judge to order a hearing on present sanity is not a subjective one but

rather a doubt to be determined objectively from the record. (See *People* v. *Tomas* (1977) 74 Cal.App.3d 75, 90 [141 Cal.Rptr. 453].)

■ The question here is whether the evidence concerning present incompetency by Sundberg was of such quality as to meet the substantial evidence test. If so, the trial judge had no discretion. The criminal proceedings were required to be suspended and a hearing taken as to defendant's present sanity. ■ Failure to make such hearing where one is required is an error of jurisdictional proportion. (See *People* v. *Laudermilk, supra*, 67 Cal.2d 272, 282.) The error goes to the legality of the proceedings themselves because "conviction of an accused person while he is legally incompetent violates due process." (*Pate* v. *Robinson, supra*, at p. 378 [15 L.Ed.2d at p. 818].)

■ A review of all of the evidence of present insanity presented to Judge Gilliam in the course of the trial and before sentencing included evidence of Sundberg's commitment to Patton State Hospital before trial after section 1368 proceedings, evidence in the presence of the trial judge which caused Judge Gilliam to make inquiry as to whether he wished to exclude diminished capacity evidence from trial, and evidence of his outbursts at trial as well as his bizarre requests at the sentencing proceedings. There were also the reports of various psychiatrists who had diagnosed Sundberg as a paranoid schizophrenic with insane delusions relating to a conspiracy to kill him due to a claim of inheritance. All concluded that Sundberg labored under a delusional system. The fact Sundberg was able to remain stoic in front of the jury while the proceedings were going on is not dispositive of the issue of competence. ■ As stated in *People* v. *Samuel* (1981) 29 Cal.3d 489, 503 [174 Cal.Rptr. 684, 629 P.2d 485]: "Although a defendant subject to uncontrollable public outbursts may be found unfit to stand trial [citation], it does not follow that a defendant who is physically submissive is automatically competent. Evidence that a defendant can obediently walk into the courtroom and sit quietly during the trial does not constitute substantial proof of competence; indeed, it could describe one in a catatonic state." Nor does the test of whether defendant is mentally competent turn on whether he has orientation as to time and place.

■ Approximately 90 percent of the patients discharged from Atascadero in 1978 restored with certification of restoration of mental competency had a diagnosis similar to Sundberg—schizophrenia, para-

noid type. (Pendleton, *Treatment of Persons Found Incompetent to Stand Trial* (Sept. 1980) Am. J. Psychiatry, 137.9, pp. 1098-1099.) These returnees were "fragile." It was common for such a defendant to regress or deteriorate and it was "prudent" for courts to have professionals monitor the defendant in a jail in order to observe and provide treatment in case of deterioration.

Finally of greatest significance here is the fact the trial counsel told the trial court Dr. Kripke—who had previously examined defendant and had found him mentally competent to stand trial—had given the further opinion that Sundberg was probably not mentally competent to stand trial at this time. He thereupon requested the court to have Sundberg examined by another psychiatrist and "make that determination before we proceed any further." In substance the trial counsel sought a continuance to confirm what Dr. Kripke had represented earlier that morning.

In *People* v. *Schneider, supra*, 95 Cal.App.3d 671, 678, defense counsel claimed two psychiatrists examined Schnieder and concluded he was not then competent to stand trial. Counsel did not produce the reports. However, when offered a continuance by the court in order to do so, the attorney declined. *Schneider* held in such circumstances the court had reason to discount counsel's allegations. Here the situation is reversed. Trial counsel represented an examining physician would conclude Sundberg was not mentally competent to stand trial and requested a continuance to allow further examination, yet the court in substance refused the request. While nowhere in the record does there appear a denial, yet the court's failure to act was in effect a denial. The court's response was to conduct its own examination of Sundberg and to come to a patently irrelevant conclusion that Sundberg was oriented to time and place and therefore competent to stand trial. Such is not the test nor the appropriate procedure when such representation and request has been tendered.

The totality of evidence before the trial court required the court to grant the continuance to ascertain if Dr. Kripke could offer "substantial" evidence. The trial court committed error in refusing to continue the matter to allow the psychiatrist's opinion to be placed properly before the court.

In view of our determination that reversal is required by reason of the trial court's failure to give counsel the opportunity to present psychiat-

ric evidence on the issue of Sundberg's mental competence to stand trial, we need not determine the further issues tendered by this appeal as basis for reversal.[1]

Judgment reversed.

Brown (Gerald), P. J., and Cologne, J., concurred.

---

[1]We make this observation, however, in passing upon the competency-of-counsel question tendered by Sundberg. Mr. Gusky chose to ignore a most bizarre pattern of behavior by his client, failed to produce enormous quantities of evidence concerning a paranoid schizophrenic disease, a conceded delusional system involving threats to kill Sundberg, all of which would appear to rationally enter into Sundberg's intent, mental status at the time he pulled the trigger and killed Johnson. Gusky's much stated reason for so doing was that he was riding entirely on a justifiable homicide defense and introduction of the diminished capacity evidence would tend to negate his primary thrust. However, what Gusky appears to have overlooked is the fact that there is testimony from a disinterested witness who stood outside the bar at the hour and night in question and saw victim Johnson stagger out of the barroom door, fall face down on the sidewalk and who testified as to Sundberg's pointing the pistol downward at the back of Johnson's head and firing two charges into his brain, killing him. This percipient witness evidence was corroborated by objective scientific evidence as to the entrance, angle of bullets entering and passing through the decedent's brain. Thus Gusky's percentage evaluation of the various possibilities upon trial do not, in the opinion of this court, have much weight when viewed in the light of the objective facts as to the way this killing occurred. The successful defense of justifiable homicide or self-defense appears to be highly improbable.

With respect to the further contention of error regarding the failure upon the part of the trial court to *sua sponte* give instruction as to diminished capacity, this case is repleat with evidence concerning the defendant's diminished capacity. However, all evidence concerning the defendant's irrationality and system of delusions was systematically excluded from the trial on the guilt phase. Only occasional outbursts suggested in this phase the mental problems of the defendant. It cannot be said as from this perspective that there was such evidence before the trial court as to require the trial court *sua sponte* to give the diminished capacity instruction.