Filed 12/8/14  P. v. Vela CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238228 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA067007) |
| v. | |
| VICTOR FIDENCIO VELA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Antonio Barreto, Jr., Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Victor Fidencio Vela (Vela), appeals his conviction for first degree murder and assault by means likely to produce great bodily injury, with deadly weapon use, prior serious felony conviction and prior prison term enhancements (Pen. Code, §§ 187, 245, subd. (a)(1), 12022, subd. (b)(1), 667, subds. (a)-(i), 667.5).[1] He was sentenced to state prison for a term of 111 years to life.[2]

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

On February 28, 2008, Duwayne Bennett and co-workers Ryan Comstock and Shaun Lucy went for drinks after work at Brennan's Pub in Marina Del Rey. Vela and a friend arrived at Brennan's on skateboards at about 1:00 a.m. When one of the bar's bouncers told Vela skateboards were not allowed inside because they could be used as weapons, Vela said: "I have better weapons on me than that."

Vela was allowed inside without his skateboard just to look around. Comstock, who happened to be walking out of the bar at that moment, bumped into him. Vela got mad and told Comstock to apologize, which Comstock did but only "begrudgingly . . . like he really didn't have to say it." Rasaan Bowman, one of the bouncers, intervened. He told Vela that Comstock "had been inside drinking, and he probably didn't know what he was doing and . . . just to let it go."

Twenty or thirty minutes later, Comstock, Lucy and Bennett left the bar and went across the street to the International House of Pancakes (IHOP). As Comstock walked past a pole, he looked in Vela's direction and slapped the pole. Vela "wasn't happy about [this]" and his friend said, "Did you see that? We shouldn't let him get away with that."

---

[1]   All further references are to the Penal Code unless otherwise specified.

[2]   After we originally filed this opinion, we granted rehearing and directed the parties to submit supplemental briefing limited to the issue of Vela's competency to stand trial. We have reviewed and considered the briefs filed by the parties.

Vela told Bowman "he felt disrespected because he had to bring it to this person's attention to say excuse me and everything, and he felt disrespected in that regard." Bowman tried to calm Vela down, but it seemed Vela was "stewing it over in his head a little bit, thinking whether or not it would be a good idea to do anything about it." Eventually, Vela and his friend walked away.

While Comstock, Lucy and Bennett were in the IHOP parking lot, Lucy heard someone say, "There he is over there." Comstock saw Vela's friend pointing at him and saying, "Yeah, that's the guy." Vela and his friend approached Lucy and Bennett. Comstock was standing 10 or 15 feet away. Vela seemed agitated and angry. He told Lucy and Bennett he was upset about what happened at Brennan's. Lucy apologized to him and Bennett said they didn't want any trouble. Lucy and Bennett then talked to Vela about motorcycles in an attempt to calm him down. By this time Comstock was standing 20 to 25 feet away and was not involved in the conversation.

After talking for about 10 minutes, Lucy told Vela he was hungry and that he and his friends were going into the IHOP to eat. Lucy testified Vela "got angry [when Bennett] tried to clear the air for the last time before we went in to eat," and Vela "flipped out." From his pants, Vela pulled out a chain with a lock on the end of it. He moved toward Bennett and began hitting him with the chain, saying "Are you trying to be a hero?" Vela swung the chain like a whip, hitting Bennett in the back and in the head. Bennett said, "Stop. You don't want to do this. What are you doing?" Bennett was retreating and trying to defend himself, but Vela continued to hit him with the chain and lock. It appeared to Lucy and Comstock that Vela was controlled and focused as he swung the chain.

At some point, Bennett grabbed the chain and Vela got close to him. Lucy saw Vela make stabbing motions at Bennett with his left hand while holding the chain with his right hand. After the chain had fallen to the ground, Comstock saw Vela punching Bennett with a motion indicating Vela had something in his hand. Bowman, who was watching from across the street, saw Vela hitting Bennett. Another bystander, Jay Felker, saw Vela holding Bennett's shirt by the collar with one hand while he was

3

"slugging [Bennett] in an upward motion" with the other hand. Comstock stepped in and hit Vela in the back with a skateboard. He testified Vela "backed up, grabbed the chain off the ground and ran off." Lucy testified he believed Comstock hit Vela either after or while Vela was stabbing Bennett.

Oswaldo Benedid, who had been inside the IHOP, ran outside to stop Vela from hitting Bennett with the chain. Benedid pushed Vela off Bennett and told him to leave. Vela hit Benedid with the chain and ran off. Bennett was covered in blood. He called out Lucy's name and then collapsed.

A police officer apprehended Vela about 1:45 a.m. By that time, Vela had neither a chain nor a knife in his possession. A knife, with Bennett's blood on it, was later recovered from a planter box in front of a nearby shop. A witness had seen someone throw an object into the planter box.

The autopsy revealed Bennett died from a "sharp force injury to the chest" consistent with a knife wound. A portion of Bennett's heart had been pierced. He also sustained two non-fatal sharp force injuries to his torso and one to the back of his head.

## CONTENTS

1. The trial court erred by failing to hold a competency hearing.

2. There was insufficient evidence to sustain a first degree murder conviction.

3. Defense counsel was ineffective for not objecting to improper lay opinion testimony.

## DISCUSSION

1. *Trial court did not err by failing to hold a competency hearing.*

Vela contends his convictions must be reversed because the trial court failed to hold a hearing to determine if he was competent to stand trial. This claim is meritless.

a. *Legal principles.*

"The due process clause of the federal Constitution's Fourteenth Amendment prohibits trying a criminal defendant who is mentally incompetent. [Citations.] A defendant is deemed competent to stand trial only if he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" ' and ' "has a

4

rational as well as factual understanding of the proceedings against him." ' [Citation.] [¶] When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally competent may the matter proceed to trial. [Citation.] [¶] California law reflects those constitutional requirements. Section 1368, in subdivision (a), requires a trial court to suspend criminal proceedings at any time 'prior to judgment' if the court reasonably doubts 'the mental competence of the defendant.' A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own. . . ." (*People v. Ary* (2011) 51 Cal.4th 510, 517.)

"A defendant is presumed to be mentally competent to stand trial. (§ 1369, subd. (f).) [¶] . . . [S]ection 1368 provides that if the trial court has any doubt as to the defendant's competence to stand trial, it must state that doubt in the record and inquire of counsel whether, in his or her opinion, the defendant is mentally competent. (§ 1368, subd. (a).) The trial court is authorized to conduct a competency hearing on its own motion and at the request of counsel. (§ 1368, subd. (b).) [¶] . . . '[O]nce the accused has come forward with substantial evidence of incompetence to stand trial, due process requires that a full competence hearing be held as a matter of right. [Citation.] In that event, the trial judge has no discretion to exercise. [Citation.] As we also have noted, substantial evidence of incompetence is sufficient to require a full competence hearing even if the evidence is in conflict. [Citation.] We have concluded that where the substantial evidence test is satisfied and a full competence hearing is required but the trial court fails to hold one, the judgment must be reversed. [Citation.]' " (*People v. Young* (2005) 34 Cal.4th 1149, 1216-1217, fn. omitted.)

"In this context, substantial evidence means evidence that raises a reasonable doubt about the defendant's ability to stand trial. [Citation.] The substantiality of the evidence is determined when the competence issue arises at any point in the proceedings. [Citation.] The court's decision whether to grant a competency hearing is reviewed under

5

an abuse of discretion standard. [Citations.] [¶] Substantial evidence of incompetence may arise from separate sources, including the defendant's own behavior. For example, if a psychiatrist or psychologist 'who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.' . . . [A] defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel." (*People v. Ramos* (2004) 34 Cal.4th 494, 507-508.) "[A] trial court is not required to order a competence hearing based merely upon counsel's perception that his or her client may be incompetent. [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 738-739, fn. 7.)

        b. *Background.*

During a pretrial hearing at which the defense was seeking authorization to have an MRI[3] done, defense counsel informed the trial court he had received a report from a medical expert, psychologist Dr. Abraham Argun, regarding Vela's competence to stand trial. Argun had been appointed to advise counsel about a potential insanity defense for Vela. Defense counsel told the trial court it was Argun's opinion Vela was incompetent to stand trial at the present time, and that counsel felt compelled to alert the court to Argun's opinion.

The following colloquy then occurred:

"The Court: Now, that's not a report that I've seen. Do you happen to have it with you?

---

[3]    Defense counsel was seeking authorization to have an MRI (magnetic resonance imaging) scan performed, presumably because the defense psychologist believed Vela might be suffering from organic brain damage.

"[Defense counsel]: Well, this was a confidential report, and . . . I have part of the report. The other part . . . I don't want to release yet because it goes into other issues regarding sanity. But I can show the court the part on competence.

"The Court: That's the only part I want to see.

"[Defense counsel]: That's fine. May I approach, Your Honor?[4] [¶] . . . [¶]

"The Court: All right. Well, that is clearly what that pertinent part of the report says. And I agree with [defense counsel]. That comment cannot be ignored. Interestingly Dr. Argun was not appointed for the purpose of making a competency evaluation, but he's taken it upon himself to do that which was within his professional discretion, I suppose. [¶] So now what we have to do is we have to have an appointment for the purpose of either confirming or excluding that very finding, so hang on a second."

The trial court restated its concern that Argun had provided an unsolicited opinion,[5] and also said Argun's desire to conduct an MRI examination in order to test Vela's competence seemed to contradict the notion he had already found Vela incompetent: "Well, I think [the MRI order is] going to be necessary anyway because one of the things that Dr. Argun said in the report, the part of which you gave me, is that he would like to have that information on the subject of competence, which is interesting because he's saying, I'd like to have further information. But he's saying, by the way, he's not presently competent. So I don't understand how he can say both of those things at the same time because they're mutually inconsistent. But I'm prepared to sign the MRI order."

The trial court then summarized its reasoning regarding the competency issue: "[W]e might as well put our cards on the table here. There's two [*sic*] issues here. Number one is, I was dealing with Mr. Vela for a very long time while he represented

---

**4**      At this point, defense counsel showed the trial court page 5 of Argun's confidential report.

**5**      "Well, the main concern that I have is . . . that he has provided information that was not requested. And so the court, based upon that document, is not going to join in the declaration of doubt."

7

himself, and I didn't see anything about Mr. Vela that indicated any lack of competence. That's number one. [¶] Number two; that doesn't mean that something hasn't recently developed. [¶] But number three, and most disturbing, Argun was not appointed for the opinion that he rendered, and I don't know that he would have conducted the examination the same way. So it's like he's volunteering information. [¶] That's why I'm not joining in the declaration right now. That's exactly the reason I'm not doing it, because I just am not relying on that report. I appreciate that counsel is doing it for obvious reasons, but that doesn't mean the court has to join just because defense counsel says so."

At the next hearing, the trial court appointed two other mental health professionals to examine Vela. Defense counsel asked for the appointment of Dr. Rebecca Crandall, and the prosecutor asked for the appointment of Dr. Marc Cohen.

Dr. Crandall subsequently reported to the trial court that Vela "was not cooperative with my interview. He withheld information and had a petulant attitude. There were no signs of significant mental illness during the interview. I was unable to accurately assess his competency to stand trial due to his noncooperation, which was voluntary and not the product of mental illness." Dr. Crandall noted Vela "does not have a documented mental health history. He has never taken psychiatric medication. During my clinical interview, he . . . tried to appear more impaired than he actually is. . . . It was evident . . . he understood concepts of evidence and witnesses as well as the roles of the court personnel. His behavior suggested malingering in order to interfere with the court proceedings. I was unable to make an accurate assessment of his competency to stand trial due to his lack of cooperation, which was voluntary. There was no indication that he was suffering mental illness that would impair his ability to understand his legal proceedings or to assist his attorney in forming a defense."

Dr. Cohen also believed Vela was malingering. Dr. Cohen said Vela's "presentation was consistent with an individual attempting to feign memory impairment and is not consistent with any known mental illness." "Mr. Vela's thought process was linear and logical when he chose to respond to the question asked. . . . [He was] evasive and vague when he was asked to speak about seemingly benign details, such as his

8

upbringing, and there was a noticeable pause in the time it took for Mr. Vela to reply to basic questions, such as his date of birth. Individuals attempting to simulate mental illness will frequently employ long pauses and answer questions in a noncommittal and equivocal manner. . . . In summary, Mr. Vela's presentation was consistent with an individual attempting to feign mental illness, in particular severe cognitive impairment." Cohen concluded Vela "does not require[ ] psychiatric treatment at the present time," was competent to stand trial, and "was clearly attempting to simulate a mental disorder."

After considering these two new medical reports, the trial court again declined to declare a doubt as to Vela's competency: "Both mental health professionals have rendered the same opinion, which is that there is no issue of the defendant's present competence as defined in the Penal Code. The Court did not declare a doubt in this matter previously, and the opinions of the two doctors now confirm the court's action in not declaring a doubt."

c. *Discussion*.

Vela argues Dr. Argun's report constituted substantial evidence he was incompetent to stand trial and, therefore, it was improper for the trial court to seek further medical opinion before reaching a decision because "this was precisely the course of action that was disapproved in [*People v. Pennington* (1967) 66 Cal.2d 508]." As the Attorney General points out, however, *Pennington* said the substantial evidence test was met if a mental health professional "who has had sufficient opportunity to examine the accused, *states under oath*" the defendant is incompetent. (*Id*. at p. 519, italics added.) Argun's report had not been made under oath.

In response, Vela cites *People v. Tomas* (1977) 74 Cal.App.3d 75, an opinion which appears to dispense with the "under oath" requirement. The Attorney General, in turn, argues: "[T]o the extent *Tomas* holds that a single unsworn medical report may constitute substantial evidence of mental incompetence triggering a formal competency hearing, the holding appears to be incorrect and contravenes . . . California Supreme Court precedent . . . . In that regard, *Tomas* was wrongly decided and should not be followed."

9

The "under oath" requirement set forth in *Pennington* has been stated again and again by our Supreme Court, most recently in *People v. Sattiewhite* (2014) 59 Cal.4th 446, 465, italics added: " '[I]f a qualified mental health expert who has examined the defendant " 'states *under oath* with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel,' " that is substantial evidence of incompetence.' [Citation.]" (Accord *People v. Lewis* (2008) 43 Cal.4th 415, 525, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047; *People v. Welch* (1999) 20 Cal.4th 701, 738.) Vela argues this "under oath" element is merely dicta, repeated again and again but never actually relied on for the holding in any case. But even if that assertion is correct, it is well-established that "[d]icta from the California Supreme Court is highly persuasive and should generally be followed." (*City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 781, fn. 24; accord *Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 393-394, fn. 2; *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 355.)

However, we need not resolve the validity of *Tomas* because, even assuming arguendo that Argun's report could have qualified as substantial evidence of incompetency without having been made under oath, we conclude the court did not abuse its discretion by refusing to order a section 1368 competency hearing. Rather, the trial court properly asked for, and relied upon, additional medical reports because Argun's incompetency finding was less than credible.

It is apparent Argun himself believed his incompetency finding was a tentative and preliminary conclusion, and that further diagnostic work needed to be done. At the top of page 5, following a capitalized and bold heading entitled "Diagnosis," the first paragraph (which itself is bolded, but not capitalized) reads, in part: "Further diagnostic and historical work are necessary to come to a diagnostic clarity. The results were mixed. Objective tests were invalid, suggesting possible malingering. . . . Diagnostic impressions are tentative at this point." At the bottom of page 5, beneath a second

10

heading (bold, but not capitalized) entitled "Clinical Forensic Issues," there are the following two sentences, which are neither bold nor capitalized: "The defendant is suffering from mental, neuro psychological and medical conditions. He is not competent to stand trial at this time." Hence, although page 5 of Argun's report includes a statement that Vela is presently incompetent, the statement taken in context demonstrates this was just a tentative diagnostic impression and that Argun recognized he needed to rule out "possible malingering" by Vela.

In *People v. Lewis, supra,* 39 Cal.4th 970, the trial court disregarded a medical finding of incompetency, saying: "I found Dr. Davis to be less than credible and I have no confidence in his conclusion." (*Id*. at p. 1047.) Our Supreme Court affirmed this ruling: "[T]he trial court did not err in finding no substantial evidence of mental incompetence and no reason to suspend the criminal proceedings. . . . [¶] Lewis suggests . . . the testimony of Dr. Davis compels a contrary result. We disagree. The trial court found such evidence to be 'less than credible.' Moreover, independent of both its doubts about Dr. Davis's credibility and the contrary testimony of other experts, the court could conclude that Davis's opinion did not satisfy the substantial-evidence standard described above. [¶] Specifically, the record supports the court's view that Dr. Davis's opinion was 'pre-fixed.' . . . Moreover, Dr. Davis conceded that his conclusion regarding Lewis's competence was tentative and not definitive. The psychiatrist volunteered that 'what may be crucial matter . . . for final psychiatric diagnosis' was lacking." (*Id*. at pp. 1047-1048.)

Vela rightly notes the trial court here seemed chiefly concerned with the fact Argun had not been appointed to examine Vela on the issue of competency to stand trial. However, the trial court also discussed the inconsistency between Argun's asserted incompetency finding and his stated need for more information. In any event, we review the trial court's ruling, not its reasoning, and we will affirm if the ruling was correct on any ground. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of

11

the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' "].)

Because the single, unsigned page of Argun's report shown to the trial court was manifestly a preliminary, tentative medical opinion, the trial court was justified in seeking other medical reports before deciding whether or not to declare a doubt regarding Vela's competency. The trial court was further justified in refusing to declare a doubt as to Vela's competency when both additional reports found evidence that Vela was malingering. Hence, the trial court did not abuse its discretion by refusing to hold a competency hearing. (See *People v. Ramos, supra,* 34 Cal.4th at pp. 507-508.)

2. *Sufficient evidence to support first degree murder conviction.*

Vela contends there was insufficient evidence to sustain his conviction for first degree murder. This claim is meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing

12

court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id.* at p. 12, italics added.)

The various types of premeditation and deliberation evidence have been described as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a

13

'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

b. *Discussion*.

Vela contends the trial evidence failed to satisfy the *Anderson* test. We disagree.

Vela argues there was no motive evidence because he did not have any interaction whatsoever with Bennett prior to the fight. And while Vela may have had an animus toward Comstock, the fight in the IHOP parking lot had been between him and Bennett, and nothing he did was directed at Comstock. But Bennett was Comstock's companion that night and there was ample evidence Vela transferred his animosity from Comstock, who had been rude to him at the bar, to Bennett. There was substantial evidence Vela had been motivated to kill Bennett because, after being angered by Comstock's rude behavior, Vela took offense when Bennett tried to calm him down.

The manner of the killing also tended to show premeditation and deliberation. " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) The evidence showed Vela initially attacked Bennett with the lock and chain, and only after hitting him repeatedly with that weapon did Vela escalate his attack by pulling out a knife and stabbing the unarmed Bennett in the heart. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [that defendant "stabbed [the victim] without provocation directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart" constituted premeditation and deliberation evidence]; *People v. Silva* (2001) 25 Cal.4th 345 369 ["The manner of killing – multiple shotgun wounds inflicted on an

14

unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder."].)

Vela's suggestion he might not have premeditated and deliberated because Bennett triggered a sudden explosion of violence, by saying something terribly disturbing to him, is not supported by the evidence. Vela asserts there was "uncontradicted evidence [his] demeanor changed radically at what he thought Mr. Bennett had said and that he spoke words of disbelief or offense in response to Bennett's words ('What, what, what?' or 'Are you trying to be a hero?')" But the evidence showed Bennett's words were not provocative. Lucy testified Bennett was trying "to clear the air" and Comstock testified Bennett merely asked Vela, "Is everything cool?" Moreover, the evidence showing Vela had earlier bragged to one of the bouncers that he was in possession of dangerous weapons tended to show he was hardly in need of inflammatory provocation to become violent.

Finally, the fact Vela fled the scene after stabbing Bennett and tried to conceal his weapons tended to establish premeditation and deliberation. (See, e.g., *People v. Perez* (1992) 2 Cal.4th 1117, 1128 ["Additionally, the conduct of defendant *after* the stabbing . . . would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing."].)

We conclude there was sufficient evidence to sustain Vela's first degree murder conviction.

3. *No ineffective assistance of counsel regarding lay opinion testimony.*

Vela contends the trial court was ineffective for failing to object to testimony constituting improper lay opinion evidence. This claim is meritless.

a. *Background.*

During the prosecutor's examination of Lucy the following colloquy occurred:

"Q. And when [Vela] pulled the chain out, did he appear to be controlled to you?

"A. Yes.

"Q. In other words . . . knew what he was doing?

"A. Yes.

15

"Q. As he walked and swung the chain at [Bennett], did he appear in control to you?

"A. Yes.

"Q. When he was punching [Bennett], did he appear to be in control to you?

"A. Yes.

"Q. Did he appear to be focused?

"A. Yes."

During her examination of Comstock, the prosecutor asked: "During the time of this fight, did the defendant appear to be in control of what was going on?", to which Comstock answered, "Yes."

     b. *Legal principles.*

A claim of ineffective assistance of counsel based on *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052], has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.) "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

"[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an

16

explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance. [Citation.]" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington, supra,* 466 U.S. at p. 697.)

"Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence, we have held that the conviction should be affirmed." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1215; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [decision whether to put on witnesses is "matter[] of trial tactics and strategy which a reviewing court generally may not second-guess"].) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on other grounds by *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

c. *Discussion.*

Vela contends defense counsel should have objected to this testimony because lay witnesses may not give opinions about another person's state of mind. He argues, "Reasonably competent counsel would have objected to this line of questioning on the grounds of improper lay opinion, lack of personal knowledge, speculation, and irrelevance."

Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." "A lay witness may express an opinion based on his or her perception, but only where

17

helpful to a clear understanding of the witness's testimony [citation], 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 889.) " ' "Lay opinion testimony is admissible . . . as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' [Citations.]" ' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)

Vela asserts "the prosecutor defined the term 'in control' as meaning whether appellant 'knew what he was doing.' With that definition, the prosecutor was not seeking a description of observed behavior but of what appellant was thinking." He argues: "[W]hether appellant was committing his assault in a calculated way or as an impulsive, rash reaction should have been left to the jury. The testimony apart from the questions about 'in control' and 'knew what he was doing' was detailed enough to provide a basis for the jury to formulate its own assessment as to appellant's state of mind."

But a percipient witness may offer such an opinion when it is based on personal observation and it helps to clarify the witness's testimony. (See, e.g., *People v. Chatman* (2006) 38 Cal.4th 344, 397 [witness who observed defendant kicking high school custodian was properly allowed to testify that defendant " 'seemed to be enjoying it' "]; *People v. Farnam* (2002) 28 Cal.4th 107, 153 [correctional officer's testimony that defendant stood " 'in a posture like he was going to start fighting' " was "based on his personal observations that defendant was being 'very defiant' about the court order and physically stood with his hands at his side and left foot forward"].)

Defense counsel was not ineffective for failing to object to this testimony.

18

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, J.[*]


We concur:


KLEIN, P. J.


ALDRICH, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.